# ADDENDUM

## TABLE OF CONTENTS


5 U.S.C. § 552a ........ Add.1

18 U.S.C. § 2721 ........ Add.2

28 U.S.C. § 2342 ........ Add.3

49 U.S.C. § 31106 ........ Add.4

49 U.S.C. § 31309 ........ Add.5

49 C.F.R. § 384.225 ........ Add.6

Communications between FMCSA and AAMVA (June-Aug. 2026) ........ Add.7

CDLIS contract between FMCSA and AAMVA (eff. June 2008) ........ Add.28

First Liberatore Declaration (Aug. 17, 2026) ........ Add.47

Temporary Restraining Order (Aug. 20, 2026) ........ Add.54

Second Liberatore Declaration (Sept. 3, 2026) ........ Add.70

Graham Declaration (Sept. 3, 2026) ........ Add.79

Opinion and Order on Preliminary Injunction (Sept. 17, 2026) ........ Add.83

Order Denying Motion to Clarify (Oct. 2, 2026) ........ Add.100

Third Liberatore Declaration (Oct. 8, 2026) ........ Add.101

Order Denying Stay of Preliminary Injunction (Oct. 29, 2026) ........ Add.105

Order Granting 5 U.S.C. § 705 Stay (Oct. 29, 2026) ........ Add.108

## 5 U.S.C. § 552a

### § 552a(b). Conditions of disclosure

(b) Conditions of disclosure.--No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be--
[…]
(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;
[…]

### § 552a(e). Agency requirements

Each agency that maintains a system of records shall--
(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;
(2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs;
(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual--
(A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;
(B) the principal purpose or purposes for which the information is intended to be used;
(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and
(D) the effects on him, if any, of not providing all or any part of the requested information;

**18 U.S.C. § 2721**

**§ 2721(a). In general**

(a) In general.--A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity:

(1) personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section; or

(2) highly restricted personal information, as defined in 18 U.S.C. 2725(4), about any individual obtained by the department in connection with a motor vehicle record, without the express consent of the person to whom such information applies, except uses permitted in subsections (b)(1), (b)(4), (b)(6), and (b)(9): Provided, That subsection (a)(2) shall not in any way affect the use of organ donation information on an individual's driver's license or affect the administration of organ donation initiatives in the States.

**§ 2721(b). Permissible uses**

Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purposes of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters 301, 305, and 321-331 of title 49, and, subject to subsection (a)(2), may be disclosed as follows:

(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

[…]

**28 U.S.C. § 2342**

**§ 2342. Jurisdiction of court of appeals**

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

(2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3) all rules, regulations, or final orders of--

(A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

(B) the Federal Maritime Commission issued pursuant to section 305,1 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

(6) all final orders under section 812 of the Fair Housing Act; and

(7) all final agency actions described in section 20114(c) of title 49.

**49 U.S.C. § 31106**

**§ 31106(e)(1). Information availability and privacy protection policy**

The Secretary shall develop a policy on making information available from the information systems authorized by this section and section 31309. The policy shall be consistent with existing Federal information laws, including regulations, and shall provide for review and correction of such information in a timely manner.

**49 U.S.C. § 31309**

**§ 31309(a). General requirement**

The Secretary of Transportation (referred to in this section as the "Secretary") shall maintain an information system (referred to in this section as the "information system") that will serve as a clearinghouse and depository of information about the licensing, identification, and disqualification of operators of commercial motor vehicles. The information system shall be coordinated with activities carried out under section 31106. The Secretary shall consult with the States in carrying out this section.

**§ 31309(c). Availability of information**

Information in the information system shall be made available and subject to review and correction in accordance with the policy developed under section 31106(e).

**§ 31309(d). Authorized operator**

The Secretary may authorize a qualified entity (referred to in this section as the "authorized operator")--

(1) to operate, maintain, develop, modernize, and enhance the information system; and

(2) to collect fees on behalf of the Secretary in accordance with subsection (e); and

(3) to use any fees collected in accordance with that subsection.

**§ 31309(e). Fee system**

(1) In general.--The Secretary or the authorized operator, as applicable, may charge a reasonable fee for use of the information system.

[…]

(5) Authorized operator.--If the Secretary designates an authorized operator under subsection (d)--

(A) the Secretary shall not be charged a fee for access to, use of, or data in the information system; and

(B) the Secretary shall have access to fee statements on a quarterly basis.

**49 C.F.R. § 384.225**

**§ 384.225. CDLIS driver recordkeeping**

The State must:

[…]

(e) Only allow the following users or their authorized agents to receive the designated information:

(1) States—All information on all CDLIS driver records.

(2) Secretary of Transportation—All information on all CDLIS driver records.

(3) Driver—All information on that driver's CDLIS driver record obtained on the CDLIS Motor Vehicle Record from the State according to its procedures.

(4) Motor Carrier or Prospective Motor Carrier—After notification to a driver, all information on that driver's, or prospective driver's, CDLIS driver record obtained on the CDLIS Motor Vehicle Record from the State according to its procedures.

**U.S. Department of Transportation**

**Federal Motor Carrier Safety Administration**

**1200 New Jersey Ave, SE**
**Washington, DC 20590**

June 25, 2026

Ian M. Grossman, President & CEO
American Association of Motor Vehicle Administrators
4401 Wilson Blvd., Suite 700
Arlington, VA 22203

Mr. Grossman,

As a part of the Federal Motor Carrier Safety Administration's (FMCSA) ongoing efforts to ensure the integrity and issuance of Commercial Driver's Licenses (CDLs) and Commercial License Permits, we conduct routine reviews and data analysis to oversee the national CDL program.

In accordance with Article 7(b) of the 2013 Commercial Driver's License Information System (CDLIS) Cooperative Agreement, FMCSA requests the American Association of Motor Vehicle Administrators (AAMVA) provide the following information for all individual pointers within CDLIS for the last five years:

- Driver Name
- Date of Birth
- State of Record
- License Number
- Social Security Number (If available. If not, please provide date when this data was removed from records retained by AAMVA)

FMCSA understands the size and scope of this request and will work with AAMVA to determine the most efficient way to comply with the significant amount of data being requested. FMCSA requests that AAMVA expedite the delivery of the requested information.

We appreciate your prompt attention to this matter. Should you need additional information, please contact Patrick D. Nemons, Director of Safety Program, by email at patrick.nemons@dot.gov.

Sincerely,

Thomas Liberatore
Acting Associate Administrator for Safety

AAMVA
American Association of
Motor Vehicle Administrators

OUR VISION
*Safe drivers*
*Safe vehicles*
*Secure identities*
*Saving lives!*

June 30, 2026

***Transmitted by email***

Mr. Thomas Liberatore
Acting Associate Administrator for Safety
Federal Motor Carrier Safety Administration
1200 New Jersey Ave, S.E.
Washington, D.C. 20590

Re: Request for Driver Pointer Records of June 26, 2026

Dear Mr. Liberatore:

On behalf of the American Association of Motor Vehicle Administrators ("AAMVA"), I am writing to confirm receipt of your June 25, 2026 request for certain "information for all individual pointers within CDLIS for the last five years." We have conducted a preliminary review of data potentially responsive to the request and assess that there are approximately 17 million responsive pointer records.

As you are likely aware, this is the first AAMVA has ever received such a request from the Federal Motor Carrier Safety Administration ("FMCSA"). AAMVA is expeditiously working to assess feasibility from both a technical and legal standpoint. As we do so, we intend to work closely with FMCSA.

From a technical standpoint, our team is evaluating data storage and transfer options that will comply with security requirements for the data. We expect to have preliminary solutions in those areas soon and will ensure we coordinate with you accordingly.

From a legal standpoint, we are working with our counsel and will be coordinating with the AAMVA Board of Directors. As the request calls for "pointer records," including name, date of birth, state of record, license number, and social security number, it implicates both the Drivers' Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.*, and the privacy laws in all United States jurisdictions. We must carefully evaluate competing legal obligations to FMCSA, jurisdictions using CDLIS, and drivers to whom the information pertains.

Understanding that Section 7(b) of the Cooperative Agreement calls for access to "driver records," for authorized purposes, FMCSA personnel may access any driver record directly from the State of Record using existing transactions (CD03 and CD04) or they can retrieve CDLIS pointer information from the Central Site using the AKA Data Inquiry (CD05). Based upon our initial review, we do not believe Section 7(b) covers the current request for compilation of a dataset comprised of personal information built from 17 million "pointer records." As a preliminary matter, "pointer records," although built in large part from information in "driver records," are separate from driver records.

In any case, we will work in good faith to assess what can be provided and any necessary safeguards beyond technical transmission requirements. As we do so, we must ask that FMCSA provide AAMVA the specific intended use of the information. In particular, we must understand what agency or agencies will use the information and for what government function or functions. Such analysis is required of AAMVA in evaluating



4250 FAIRFAX DRIVE, SUITE 1000, ARLINGTON, VA 22203 | 703.522.4200 | aamva.org

the various potential disclosure justifications under the DPPA, and we anticipate that such analysis will be necessary in applying other relevant privacy laws as well.

Finally, driver records are maintained by originating jurisdictions and merely accessed via the Commercial Drivers' License Information System ("CDLIS"). As stated in Section 6(C) of the Cooperative Agreement, they are not considered a federal system of records under the Privacy Act, 5 U.S.C. § 552a and the Department of Transportation's implementing regulations at 49 C.F.R. Part 10. By comparison, the data set presently requested seems likely to create a Privacy-Act-covered system of records. To that end, we ask that you please share your analysis of whether this dataset will be a federal system of records under the Privacy Act and provide us any pertinent system of records notice ("SORN").

Sincerely,

Ian M Grossman

Ian M. Grossman
President & CEO

IMG/sfb

U.S. Department
of Transportation

Federal Motor Carrier
Safety Administration

1200 New Jersey Ave, SE
Washington, DC 20590

Ian M. Grossman, President & CEO
American Association of Motor Vehicle Administrators (AAMVA)
4401 Wilson Blvd., Suite 700
Arlington, VA 22203

Mr. Grossman,

Thank you for reaching out regarding the Federal Motor Carrier Safety Administration's (FMCSA) request for Commercial Driver's License Information System (CDLIS) data. To address your specific questions, we have outlined the agency's position on the language in the 2013 Cooperation Agreement, FMCSA's use of the CDLIS data, the Driver's Privacy Protection Act (DPPA), and Privacy Act compliance below.

FMCSA's request for the data falls solely under Article 7(b) of the 2013 Cooperation Agreement and subsequent addendum. Article 7 states that AAMVA **shall** make available to FMCSA, under subsection (b), all information on all driver records, including non-CDL holders who operate CMVs. The driver records data addressed in Article 7(b) encompasses all driver data to include the pointer records. It is clear from the language that AAMVA must provide this information upon request and that FMCSA is entitled to receive this information.

FMCSA will use the CDLIS data as part of our statutory and regulatory oversight in our ongoing efforts to ensure the integrity and issuance of Commercial Driver's Licenses (CDLs) and Commercial Motor Vehicles (CMVs).

As to AAMVA's concerns with the DPPA, it is FMCSA's position that the DPPA does not apply to this CDLIS data sharing, as this situation is explicitly covered as a permissible use under 18 U.S.C. § 2721(b)(1). This provision allows for:

> *Use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions."*

Because FMCSA is utilizing this data to fulfill its federal safety and regulatory obligations, it falls squarely within this statutory exception.

FMCSA appreciates AAMVA's concerns with the Privacy Act and whether FMCSA is creating a system of records with the data set provided by AAMVA. FMCSA will handle all legal

coordination necessary under the Privacy Act in close conjunction with our Chief Counsel and the Office of General Counsel.
We strongly encourage AAMVA's cooperation in providing this data to FMCSA as soon as possible. Our Information Technology team stands ready to help facilitate the transfer of the CDLIS data that FMCSA is entitled to receive.

Thank you for your prompt attention to this matter.

Sincerely,

Derek D. Barrs
Administrator
Federal Motor Carrier Safety Administration

AAMVA
American Association of
Motor Vehicle Administrators

OUR VISION
Safe drivers
Safe vehicles
Secure identities
Saving lives!

July 10, 2026

***Transmitted by email***

The Honorable Derek Barrs
Administrator
Federal Motor Carrier Safety Administration
1200 New Jersey Ave, S.E.
Washington, D.C. 20590

Administrator Barrs:

Thank you for your July 7, 2026 letter explaining the Federal Motor Carrier Safety Administration's ("FMCSA") position on disclosure of Commercial Drivers' License Information System ("CDLIS") pointer records. We appreciate the candid dialogue on this significant request. In the interest of transparency, this letter provides an update regarding our internal review process and the underlying issues we are working through.

As the request calls for transmittal of 17 million pointer records, it requires input from the American Association of Motor Vehicle Administrators' ("AAMVA") Board of Directors ("Board"). In addition to being an extraordinary data request, the pointer records are state records to which AAMVA has access, not AAMVA records.

To fully assess potential liability of AAMVA with respect to a disclosure of this magnitude and to ensure our Board has the information needed to provide input, we are working with our external counsel on the following issues:

- AAMVA's obligations under the federal Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.*;
- AAMVA's obligations under numerous state analogues to the DPPA;
- AAMVA's obligations under more general state privacy laws; and
- Any limitations to disclosure under AAMVA's user agreements with participating states.

We hope you will understand that, despite being expedited, our pre-disclosure analysis may take some time.

With respect to the information shared in your July 7 letter, we have several follow-up questions and are happy to provide additional context. First, we are familiar with the government functions exception to the DPPA that you cite. However, it is our understanding that such exception does not create a blanket authorization to disclose driver records whenever asked by a government agency. Rather, we must consider whether each data element requested is necessary to the governmental purposes for which it was requested. In other words, we must at least know what government agency will use the records for what government function. *See, e.g., New Richmond News v. City of New Richmond*, 881 N.W.2d 339 (C.A. Wis. 2016) (relying on *Senne v. Village of Palatine*, 695 F.3d 597 (7th Cir. 2012)). Also, as a practical matter, we anticipate that members of our Board will pose this question to AAMVA management.

Second, we appreciate that Article 7 of the Cooperative Agreement states that AAMVA "shall" provide "all information on all driver records" to FMCSA. As conveyed in our June 30 letter, we do not believe the pointer records are driver records subject to this Article. As also conveyed in that letter, FMCSA currently has access to

every driver record in the system. The current request is for AAMVA to produce a new comprehensive dataset by pulling copies of all pointer records from participating jurisdictions.

Third, we appreciate your point that FMCSA is primarily responsible for analyzing compliance with its obligations under the Privacy Act, 5 U.S.C. § 552a. However, we anticipate that at least some of AAMVA members may have concerns about the creation of a new federal system of records comprised of all pointer records pertaining to citizens of their states who hold commercial driver's licenses. Although we appreciate your point from an administrative standpoint, we do not agree that AAMVA's member states have no meaningful role under the federal Privacy Act when the source records are state records.

We would like to request an in-person meeting between FMCSA counsel and our counsel to talk through the key issues we believe inherent in the request. Such further dialogue will assist in our review and help us to prepare for important conversations with our Board. If possible to schedule such a meeting for the week of July 20, we would greatly appreciate it.

Sincerely,

Ian M Grossman

Ian M. Grossman
President & CEO

IMG/sfb

U.S. Department
of Transportation

Federal Motor Carrier
Safety Administration

1200 New Jersey Ave, SE
Washington, DC 20590

July 24, 2026

Ian M. Grossman, President & CEO
American Association of Motor Vehicle Administrators (AAMVA)
4401 Wilson Blvd., Suite 700
Arlington, VA 22203

Mr. Grossman,

Following the recent meeting between AAMVA and FMCSA leadership, FMCSA is providing this supplemental statement regarding the legal basis for the agency's access to and use of CDLIS data.

It remains FMCSA's position that the proposed CDLIS data sharing is fully authorized under the Driver's Privacy Protection Act (DPPA). Specifically, the disclosure is permissible under 18 U.S.C. § 2721(b)(1), which expressly allows for:

> *"Use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions."*

FMCSA intends to use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313, including verifying Commercial Driver's License (CDL) validity and conducting motor carrier safety assessments. Direct access to this data enables FMCSA to fulfill its core responsibilities under 49 U.S.C. § 113, constituting a clear exercise of "carrying out its functions" under federal law.

Furthermore, any subsequent redisclosure to federal partner agencies is authorized pursuant to 18 U.S.C. § 2721(c) and § 2721(b)(1), provided the data is used strictly in furtherance of legitimate government functions. FMCSA will fully comply with all statutory and administrative requirements, including maintaining disclosure logs for five years, ensuring audit and inspection availability, and executing formal interagency Data Use Agreements (DUAs).

Finally, FMCSA will maintain this data within established Systems of Records in accordance with the Privacy Act of 1974. Relevant System of Records Notices (SORNs) will be provided under separate cover.

Thank you for your prompt attention to this matter.

Sincerely,

Rebecca Pettit
Chief Counsel
Federal Motor Carrier Safety Administration

American Association of
Motor Vehicle Administrators

OUR VISION
Safe drivers
Safe vehicles
Secure identities
Saving lives!

July 24, 2026

***Transmitted by email***

Rebecca Pettit
Chief Counsel
Federal Motor Carrier Safety Administration
1200 New Jersey Ave, S.E.
Washington, D.C. 20590

**Re: Request for Driver Pointer Records**

Chief Counsel Pettit:

Thank you for the follow-up information and assurances provided by letter this morning. As shared preliminarily by email earlier today, we engaged the American Association of Motor Vehicle Administrators ("AAMVA") Board of Directors on this matter through a special meeting this afternoon.

I am able to confirm that AAMVA intends to disclose the records in compliance with applicable law, mindful of our regulatory obligations and the rights of the data owners. In furtherance of such disclosure, we are providing notice of the circumstances to our member jurisdictions, as they are the owners of the data.

The assurances you provided by letter this morning are appreciated and have helped us to reach this point. Our assessment at this juncture is that AAMVA remains exposed to liability under state laws and potentially under our jurisdiction-level CDLIS agreement obligations. It is simply the reality of this extraordinary data pull.

To facilitate our compliance while addressing necessary liability protections, we ask that the Department of Transportation ("DOT") confirm in writing that AAMVA's production of the pointer records will be an act carried out on behalf of, and at the specific direction of, DOT under AAMVA's agreements with DOT, and thereby subject to liability protection under the government contractor defense or related doctrines of derivative sovereign immunity. An assurance that such a position would be taken by the United States in the event AAMVA is sued in relation to compliance with this demand would significantly help to reduce the risk AAMVA is forced to face. Similarly, if DOT has any authorities under which it may offer indemnification, AAMVA would welcome prompt incorporation of such a term into the Commercial Driver's License Information System ("CDLIS") cooperative agreement.

As a showing of good faith while you consider our request, AAMVA's technical team will immediately commence detailed coordination with your information technology team to facilitate the transfer process, with an expectation of transfer on or around August 17.

Finally, I understand from our counsel and Mr. Cian Cashin that the meeting they had with you, DOT General Counsel Gregory Zerzan, and a Department of Justice attorney ended with an explicit threat of termination of all of AAMVA's federal grants and contracts and potential litigation if AAMVA did not inform DOT by today whether AAMVA intends to produce the 17 million pointer records. Understanding you are eager to expeditiously obtain

the designated pointer records, we ask that you not carry through on these threats. Doing so will cause significant disruption to the national commercial driver licensing program, including CDLIS. Disruption to these programs, particularly CDLIS, will have immediate negative impacts on all jurisdictions, including the inability for all 50 states and the District of Columbia to issue or renew any CDL as well as non-CDL driver licenses.

We appreciate your continued patience as we work in good faith on your extraordinary request on a very short timeline.

Sincerely,

Ian M Grossman

Ian M. Grossman
President & CEO

IMG/sfb

AAMVA
American Association of
Motor Vehicle Administrators

OUR VISION
Safe drivers
Safe vehicles
Secure identities
Saving lives!

August 7, 2026

***Transmitted by email***

Ms. Rebecca Pettit
Chief Counsel
Federal Motor Carrier Safety Administration
U.S. Department of Transportation
1200 New Jersey Ave, S.E.
Washington, D.C. 20590

Re: Request for Driver Pointer Records

Dear Ms. Pettit:

As you know, over the past approximately two weeks, the American Association of Motor Vehicle Administrators ("AAMVA") has been working on the Department of Transportation's ("DOT") demand for production of approximately 17 million master pointer records ("MPRs"), including Social Security numbers.

As we had committed to in our Friday, July 24 letter, on Monday, July 27, we provided the enclosed notice to our member jurisdictions that own the data and have worked aggressively with our counsel to assess the relevant privacy laws of all fifty-one (51) impacted jurisdictions. AAMVA's response to this demand is complicated by the fact that, on the one hand, DOT asserts that MPRs are subject to unrestricted federal access, while, conversely, many of AAMVA's member jurisdictions assert strict disclosure constraints on the data. In fact, in response to our notice, more than twenty jurisdictions have formally objected to AAMVA's proposed production of this state data.

Against this challenging backdrop, and with this new information, we have been assessing AAMVA's legal obligations, taking into account that AAMVA is a private non-profit corporation subject to compliance with state laws as a custodian of state data. We have concluded that production of the MPRs would create significant questions as to AAMVA's compliance with its obligations under many user agreements between AAMVA and states that participate in the Commercial Driver's License Information System ("CDLIS"), state civil laws prohibiting disclosure of information contained in MPRs, and even certain state criminal laws prohibiting disclosure of information contained in MPRs.

In the interest of continued transparency and as a dedicated partner to DOT, we have prepared a summary of the key state laws that your demand implicates, which is attached as Appendix A. We believe that analysis of the legal constraints set forth in Appendix A will aid DOT in understanding the ongoing complexities of AAMVA's position.

As part of our analysis, we appreciated the Federal Motor Carrier Safety Administration's ("FMCSA") letter of July 24, asserting:

> FMCSA intends to use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313, including verifying Commercial Driver's License (CDL) validity and conducting motor carrier safety assessments. Direct access to this data enables FMCSA to fulfill



4250 FAIRFAX DRIVE, SUITE 1000, ARLINGTON, VA 22203 | 703.522.4200 | aamva.org

> its core responsibilities under 49 U.S.C. § 113, constituting a clear exercise of 'carrying out its functions' under federal law.
>
> Furthermore, any subsequent redisclosure to federal partner agencies is authorized pursuant to 18 U.S.C. § 2721(c) and § 2721(b)(1), provided the data is used strictly in furtherance of legitimate government functions. FMCSA will fully comply with all statutory and administrative requirements, including maintaining disclosure logs for five years, ensuring audit and inspection availability, and executing formal interagency Data Use Agreements (DUAs).

These assurances were particularly helpful to our analysis of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq*. and numerous similar state driver data protection laws. They were also conveyed to our member jurisdiction in our notice to them.

However, our analysis was also informed by the Department of Homeland Security ("DHS") subpoena served upon AAMVA in person on Tuesday, July 28. That subpoena called for production of exactly the same information as demanded through FMCSA. The subpoena is entitled "Immigration Enforcement Subpoena," its cited legal basis is 8 U.S.C. § 1225(d), and its stated purpose is production of documents "in connection with an investigation or inquiry relating to the enforcement of U.S. immigration laws." FMCSA staff separately indicated via email that FMCSA and DHS had coordinated on their data demands and that the subpoena would be withdrawn due to AAMVA's efforts to cooperate with FMCSA. We therefore had to incorporate into our analysis the fact of an immigration enforcement purpose in collection of the data. Although AAMVA takes no policy position on that matter, as shown in Appendix A, that fact does affect the necessary legal analysis.

In light of the above, AAMVA is reconvening its Board for a meeting this Friday, August 14th. At that meeting, one of the options AAMVA will consider with respect to the data demand will be facilitating an opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data. This allows states to conduct their own analyses under applicable laws and ease the burden of DOT in coordinating with the states, while removing AAMVA from the actual disclosure decision about individual state data.

If this proceeds, we would also be willing to facilitate a forum between you or other DOT representatives to address the jurisdictions on this important matter. Please do not hesitate to let me know.

We understand that you are eager to receive initial data, including desiring some production by August 10. We will not be able to produce any bulk data prior to the upcoming Board meeting.

We are well aware that DOT and certain states may have differing views on these matters and assure you that we are not pleased about the circumstance AAMVA faces on all sides as a result of this data demand. At bottom, this is state data that does not belong to AAMVA, necessitating a measured approach.

Sincerely,

Ian M Grossman

Ian M. Grossman
President & CEO

Enclosures

Copy to:
Derek Barrs, Administrator, FMCSA
Scott S. Sheffler, Partner, Venable LLP

## Appendix A

### Summary of Restrictions on AAMVA's Disclosure of MPRs to FMCSA

***Several states restrict disclosure of Social Security numbers:***

The vast majority of MPRs contain Social Security numbers, which are subject to heightened protection under state law. AAMVA has identified at least five (5) states that expressly restrict disclosure of Social Security numbers to third parties. Colo. Rev. Stat. § 4-1-206; Ga. Code § 40-5-2; MCL § 257.307; Tex. Transp. Code § 730.007; Wis. Stat. § 343.14.

Some of these statutes include limited exceptions for disclosures to select state agencies or for specific purposes not consistent with those asserted by FMCSA. *See, e.g.*, Wis. Stat. § 343.14 (prohibiting disclosure of Social Security numbers other than to specific state agencies); Ga. Code § 40-5-2 (clarifying that the government functions exception under the motor vehicle records law permits only disclosure of name, address, driver identification number, and medical or disability information). Of the laws restricting disclosure of Social Security numbers, three (3) carry potential criminal penalties. *See, e.g.,* Ga. Code Ann. § 40-5-2(g).

AAMVA has identified the laws above as potentially restricting disclosure of unredacted MPRs to FMCSA, but does not have all the information necessary to fully evaluate which exceptions may apply. For instance, AAMVA is not involved in the collection of Social Security numbers from CDL applicants and therefore cannot assess whether any relevant consent is obtained for disclosures of Social Security numbers. States can resolve these questions and, when consistent with applicable state law, authorize disclosure of complete MPRs to FMCSA.

***Many states restrict disclosure of data for immigration enforcement:***

AAMVA has identified at least eleven (11) states that prohibit disclosure of information contained in MPRs for purposes of immigration enforcement or to agencies that primarily enforce immigration laws. Given AAMVA's express coordination with DHS, which cited civil immigration enforcement as one of its primary purposes for collecting MPRs, these laws are relevant for AAMVA's analysis. In order to disclose MPRs to FMCSA, AAMVA would need to resolve the restrictions under the following laws, at a minimum:

1. Cal. Veh. Code § 1808.48
2. Colo. Rev. Stat. § 24-72-204
3. D.C. Code § 50-1401.01b
4. 625 ILCS 5/6-110.3
5. Md. Code, Gen. Provisions § 4–320.1
6. 940 CMR § 37.04(1)
7. Nev. Rev. Stat. § 481.063
8. N.M. Stat. § 66-2-7.1
9. N.Y. Veh. & Traf. Law § 201(12)
10. Va. Code § 46.2-208(B)(9)
11. RCW § 43.17.425

The prohibitions typically have narrow exceptions that allow disclosure only in limited circumstances, such as to respond to court orders, judicial warrants, or court-issued subpoenas. *See, e.g.*, Colo. Rev. Stat. § 24-72-204 (clarifying that the government functions exception under the motor vehicle records law does not apply to requests made "for the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement . . . except as required by federal or state law or to comply with a court-issued subpoena warrant or order"); 625 ILCS 5/6-110.3 (prohibiting disclosure of personally identifying information to any immigration agent except as required to comply with a judicial warrant, court order, or court-issued subpoena); Va. Code § 46.2-208 (prohibiting disclosure "for any purposes related to civil immigration enforcement unless (i) the subject of the information provides consent or (ii) the requesting agency presents a lawful judicial order, judicial subpoena, or judicial warrant"). Of these laws, seven (7) carry potential criminal penalties. *See, e.g.*, Cal. Veh. Code § 1808.45; N.M. Stat. § 66-2-7.1. As these laws generally apply to state agencies as well as their contractors, many states have objected to any unilateral determination by AAMVA regarding permissibility of disclosure of MPRs.

***AAMVA's agreements with states restrict disclosure of state data:***

All MPRs are created by states and provided to AAMVA specifically for the operation of CDLIS to facilitate individual queries. Many of AAMVA's agreements with states classify state-provided data as "Protected" or "Confidential" and prohibit disclosure of state data to any third parties except as authorized by the state. Specifically, our analysis has revealed express restrictions on AAMVA's disclosure of state data in agreements with the following states: California, Colorado, Hawaii, Idaho, Illinois, Indiana, Maine, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, Tennessee, Utah, and West Virginia. Numerous states have objected to AAMVA's disclosure of the data on the basis of these contractual restrictions. States have also asserted that they, not AAMVA, are owners of the data and therefore responsible for determining whether and when to disclose the data in response to requests by any third party. Both sets of restrictions can be resolved by states authorizing the release of the data to FMCSA.

AAMVA
American Association of Motor Vehicle Administrators

OUR VISION
Safe drivers
Safe vehicles
Secure identities
Saving lives!

**MEMORANDUM**

**TO:** U.S. State Driver Licensing Agency Chief Administrators

**FROM:** Ian M. Grossman, AAMVA President & CEO

**DATE:** July 27, 2026

**RE:** FMCSA Request for CDLIS Pointer Records

AAMVA is writing to inform driver licensing agencies of a demand from the Federal Motor Carrier Safety Administration (FMCSA) for AAMVA to provide approximately 17 million Commercial Driver's License Information System (CDLIS) Master Pointer Records (MPR). The MPR is the information of a licensee (Driver Name • Date of Birth • State of Record • License Number • Social Security Number) contained on the CDLIS Central Site to serve as the "address book" to find the full driver record held in the individual jurisdiction system. More background on the CDLIS architecture is included as an appendix to this memo.

Pursuant to 49 U.S.C. § 31309, the Department of Transportation (DOT) is required to maintain the CDLIS system but may do so via a non-federal operator. Under this authority, and similar prior authorities, throughout the system's history FMCSA has designated AAMVA as the CDLIS operator and entered a long-standing Cooperative Agreement governing CDLIS operations. Federal statutes establish FMCSA access to all information in CDLIS and the CDLIS Cooperative Agreement provides that AAMVA shall make available to FMCSA all information on driver records.

While FMCSA has access to existing CDLIS transactions to locate a MPR and connect to the jurisdiction of record to access a full driver record, the compilation of a combined pointer dataset requires a data pull that only AAMVA can perform.

Due to the unique nature of this request, AAMVA has worked with FMCSA to secure assurances that the data will be used only for authorized purposes as outlined in the Driver's Privacy Protection Act (DPPA), specifically, as permitted under 18 U.S.C. § 2721(b)(1), which allows:

*"Use by any government agency, including any court or law enforcement agency in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions."*

More specifically, to conform to the scope of this DPPA exception, FMCSA has committed in writing to:

*"use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313, including verifying Commercial Driver's License (CDL) validity and conducting motor carrier safety assessments."*

Further, FMCSA has provided in writing its understanding and commitment that:

*"any subsequent redisclosure to federal partner agencies is authorized pursuant to 18 U.S.C. § 2721(c) and § 2721(b)(1), provided the data is used strictly in furtherance of legitimate government functions. FMCSA will fully comply with all statutory and administrative requirements, including maintaining disclosure logs for five years, ensuring audit and inspection availability, and executing formal interagency Data Use Agreements (DUAs)."*



4250 FAIRFAX DRIVE, SUITE 1000, ARLINGTON, VA 22203 | 703.522.4200 | aamva.org

AAMVA expressed concerns with the Federal Privacy Act and whether FMCSA is creating a system of records with the data set and has received confirmation from FMCSA, along with the DOT Office of General Counsel, that DOT accepts all responsibility for all legal coordination necessary under the Federal Privacy Act.

Considering the disclosure requirements under the Cooperative Agreement and these assurances, the AAMVA Board of Directors has instructed staff to work in good faith with FMCSA to produce the data with the understanding that prior notice to the licensing agencies is necessary, as we believe that the MPRs contained in the CDLIS Central Site are jurisdiction data.

While we are preparing to transmit the data within the next few weeks, AAMVA is working with counsel to fully assess any remaining legal implications, including any jurisdiction-specific-law or agreement-related limitations that may be relevant, so we can best manage all potential obligations to both the jurisdictions and DOT. Given the short timeline imposed on AAMVA, any jurisdiction that would like to provide such information for our review is asked to do so ASAP, and no later than August 3, 2026. Please provide such information to Cian Cashin, AAMVA Vice President of Government Affairs.

If you have any other questions or concerns, please feel free to contact me at any time.

IMG/sfb

# UNDERSTANDING CDLIS: A POINTER-BASED SYSTEM ARCHITECTURE

Executive Overview

## What is CDLIS?

The Commercial Driver License Information System (CDLIS) enables all states to share critical commercial driver information in real-time, ensuring that commercial drivers can only hold one valid CDL at a time and that safety-critical events are immediately reported across state lines. CDLIS supports pre-issuance checks, disqualification enforcement, and nationwide driver history management.

CDLIS is operated by AAMVA on behalf of the Federal Motor Carrier Safety Administration (FMCSA).

## The Pointer System: A Distributed Architecture

CDLIS uses a "pointer" system to maintain national oversight while protecting state sovereignty over driver records. CDLIS pointers are created for all commercial permit / license holders and for non-commercial drivers who have been convicted in a CMV (26,001 or more pounds). CDLIS currently has approximately 17.3 million pointers.

Rather than storing all driver history centrally, CDLIS employs a two-tier architecture:

• Central Site (AAMVA) — Maintains Master Pointer Records (MPRs), which point to where each driver's complete history is stored.

• State of Record — Maintains the Driver History Record (DHR), which contains all detailed driver information, convictions, withdrawals, and actions.

This distributed design allows state driver licensing agencies (SDLAs) to enforce federal standards, while states retain full control of their driver records and the authority to make licensing decisions for their own citizens.

## How Does a Pointer Work? (Simplified Example)

Imagine a state licensing official in State A is about to issue a commercial license to a driver. Before issuance, State A must check CDLIS to ensure this driver doesn't already hold a valid CDL elsewhere:

1. State A sends a search inquiry to CDLIS Central Site with the driver's identification.
2. CDLIS Central Site searches its Master Pointer Records and finds a match: "This driver has a CDL on file — State of Record is State B."
3. The Central Site sends the pointer information to State A and simultaneously requests the driver's complete Driver History Record from State B.
4. State B transmits the driver's complete Driver History Record to State A.
5. State A reviews the history and decides whether to issue the CDL.

The pointer is the "address book" entry; the DHR is the complete file.

## What Information Is Stored Where?

Master Pointer Record (MPR) — Stored at AAMVA CDLIS Central Site.

| Data Element | Purpose | Is this included in FMCSA's request? |
|---|---|---|
| Master Pointer ID | Unique identifier for each driver's pointer record | No |
| Current State & License # | Which state holds the driver's current record and what their license number is | **Yes** |
| Name & DOB | Basic identification for driver matching | **Yes** |
| 9 Digit SSN | Verification that the right person is identified | **Yes** |
| AKA Records | Also Known As names used in previous jurisdictions | No |
| CDLIS Indicator | Identifies if the pointer belongs to CDLIS or not | No |

## Sample MPR Extract (Fictional Data)

Below is an example of the information from CDLIS Master Pointer Record that FMCSA has requested.

| Field Name | Sample Value |
|---|---|
| Current State (Jurisdiction) | CO |
| Current License Number | C12345678 |
| First Name | Michael |
| Last Name | Johnson |
| Date of Birth | 05/15/1978 |
| Social Security Number | 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 |

Driver History Record (DHR) — Stored at the State of Record. **FMCSA has not requested this information.**

| Data Element | Purpose |
|---|---|
| License Status | Current commercial license status (valid, suspended, revoked, etc.) |
| License Information | License information, including license class, type, endorsements and restrictions. |
| Permit Information | Permit information, including endorsements and restrictions |
| Conviction Records | All ACD violations and convictions while driving a CMV or holding CDL |
| Withdrawal Records | License suspensions, disqualifications, revocations, cancellations |
| Conviction-Withdrawal Links | Which convictions triggered which withdrawals |
| Federal Integration | Drug & Alcohol Clearinghouse status, Medical Examiner certification status |

1200 New Jersey Avenue, SE
Washington, DC 20590

U.S. Department of Transportation
**Federal Motor Carrier Safety Administration**

August 11, 2026

Ian Grossman
American Association of Motor Vehicle Administrators
4250 Fairfax Drive, Ste 1000
Arlington, VA 22203

Mr. Grossman,

We have received your letter of August 7, 2026. The Department of Transportation ("DOT") has been committed to working with the American Association of Motor Vehicle Administrators ("AAMVA") to ensure the timely production of the pointer records DOT requested in its initial June 25, 2026, letter. In that spirit, DOT consulted with the Department of Justice and promptly provided the assurances AAMVA requested in its July 24 letter to "facilitate [its] compliance" with DOT's production request.

However, despite AAMVA's representations indicating a willingness to produce the requested records, including representing in its July 24 letter "an expectation of transfer on or around August 17," AAMVA's letter of August 7 reneges on its prior commitment to produce the records and instead intends to subject the matter to yet another board vote on August 14, at which it may, or apparently may not, decide to produce the records subject to "an opt in or opt-out choice by the states." That is unacceptable. States have no veto over the production of records that AAMVA is holding on DOT's behalf, that DOT has statutory authority and responsibility to maintain, and that are urgently needed for the federal government to help prevent fatal trucking accidents involving the many drivers to whom States have improperly issued Commercial Driver's Licenses. *See* 49 U.S.C. § 31309. This is not "state data," and State laws and choices cannot override DOT's statutory authority or AAMVA's obligation to produce DOT's own records to DOT.

Given your shift in position, DOT has no choice but to take immediate action to secure the production of the requested pointer records. Today, the Department of Homeland Security will reissue the administrative subpoena it previously withdrew. Unless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena, and considering terminating its contract with AAMVA.

U.S. Department of Transportation
**Federal Motor Carrier Safety Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

We regret that AAMVA has reneged on its prior assurances of production by August 17, and hope that AAMVA will reconsider its position. In the event it does not, DOT will pursue all available options to obtain the records to which it is entitled.

Sincerely,

*Rebecca Pettit*

Rebecca Pettit
Chief Counsel

# COMMERCIAL DRIVER'S LICENSE INFORMATION SYSTEM (CDLIS)

## The OPERATION, MANAGEMENT, ADMINISTRATION, AND MODERNIZATION COOPERATIVE AGREEMENT

**(June 9, 2008)**

## PREAMBLE

### BACKGROUND

The Commercial Motor Vehicle Safety Act of 1986, re-codified at 49 U.S.C. Chapter 313, established the requirements for participation by the States in the Commercial Driver's License (CDL) program. The goal of the statute is to improve highway safety by ensuring that drivers of large trucks and buses are qualified to operate those vehicles and to remove unsafe and unqualified drivers from the highways. The statute retained the States' right to issue a driver's license, but established minimum national standards which States must meet when licensing commercial motor vehicle drivers.

Pursuant to 49 U.S.C. §31309(a), the Secretary of the Department of Transportation (DOT) was required to establish or designate an information system to serve as the clearinghouse of information provided by the States about any individual who operates commercial motor vehicles, including his/her identification, licensing history, and disqualification history. This system, known as CDLIS, also includes information about any individual required to have a CDL who has been convicted of any of the disqualifying offenses listed in 49 C.F.R. 383.51.

In 1988, DOT's Federal Highway Administration (FHWA) entered into an agreement with the American Association of Motor Vehicle Administrators (AAMVA) and its former affiliate AAMVAnet, Inc. (AAMVAnet) to establish a communications network to implement CDLIS. The agreement designated AAMVAnet the CDLIS operator, directly responsible for managing and administering the information system. Section 106(b) of the Motor Carrier Safety Improvement Act of 1999 (MCSIA), transferred all legal documents in effect at the time of the statute's enactment, including the 1988 Designation Agreement, from FHWA to DOT's Federal Motor Carrier Safety Administration (FMCSA). It is the intent of the Parties that this Operation, Management, Administration, and Modernization Grant Agreement (Agreement) will supersede the Designation Agreement.

In August 2005, 49 U.S.C. §31309, as amended by section 4123, Pub. L. 109-59, 119 Stat. 1721, the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), provided FMCSA the authority to establish a modernization plan for CDLIS and to issue grant funding to States or an organization representing agencies and officials of States for the modernization of CDLIS.

On May 2, 2006, FMCSA published a Federal Register notice, the CDLIS Modernization Plan (71 FR 25885), detailing the statutory requirements for modernization, the phases of the modernization plan, and the availability of grant funding for AAMVA and the States to comply

with CDLIS modernization requirements. Since May 2006, FMCSA and AAMVA have entered into annual grant agreements under which AAMVA agreed to complete the tasks enumerated in the Modernization Plan.

The CDLIS Modernization was successfully completed by AAMVA, and the Modernized CDLIS was launched on [February 22, 2011]. In May 2012, the Parties mutually agreed to supplement the June 9, 2008 Operation, Management, Administration, and Modernization Cooperative Agreement between AAMVA and FMCSA for the purpose of clarifying certain matters and adding additional mutually agreed upon provisions. This Agreement, effective since June 9, 2008, continues to guide the relationship between the parties as it relates to the operation, management, administration, and modernization of CDLIS.

**PARTIES**

The Parties to this Agreement are AAMVA (also referred to herein as "Recipient") and FMCSA.

AAMVA represents agencies and officials of States for operation and modernization of CDLIS. AAMVA is a nonprofit corporation organized under the laws of the District of Columbia. AAMVA is the successor to AAMVAnet, Inc., a Virginia nonstock corporation organized under the laws of the Commonwealth of Virginia as a nonprofit corporation.

FMCSA was established as a separate administration within the U.S. Department of Transportation on January 1, 2000, pursuant to MCSIA.

**AUTHORITY**

This Agreement is executed under authority of 49 U.S.C. §31309, as amended by section 4123(a), of SAFETEA-LU; 31 U.S.C. §6301, et seq., the Federal Grant and Cooperative Agreement Act of 1977, as amended; 2 C.F.R. Part 215 and 49 C.F.R. Part 19, Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations (OMB Circular A-110); Cost Principles for Non-Profit Organizations (OMB Circular A-122, relocated to 2 C.F.R. Part 230); OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations; and Generally Accepted Accounting Principles (GAAP) as prescribed in Accounting Principles Board Opinions and other related materials issued by the American Institute of Certified Public Accountants.

**PURPOSE**

The Parties are entering into this Agreement to enable AAMVA to continue to serve as the manager, administrator, and operator of CDLIS in accordance with the terms of this Agreement and all applicable laws and regulations. The Parties also intend to set out their duties and responsibilities for the CDLIS Modernization Plan as set forth in the Federal Register notice published on May 2, 2006, and their annual grant agreements.

Specifically, the goals of this Agreement are to provide a framework for the ongoing operation, maintenance, administration, and enhancement of CDLIS by AAMVA and for modernization of

the CDLIS so that it complies with applicable Federal information technology security standards; provides for the electronic exchange of all information including the posting of convictions; contains self-auditing features to ensure that data is being posted correctly and consistently by the States; integrates an individual's CDL and the medical certificate as required in the final rule, "Medical Certification Requirements as Part of CDL,"; and provide a schedule for modernization of the system. In accordance with the Modernization Plan as required in 49 U.S.C. §31309(e)(3), States will fund future efforts to modernize CDLIS.

## ARTICLES OF RESPONSIBILITIES

### ARTICLE 1. Funding – Period of Availability

Federally appropriated funds obligated to this Agreement are available until expended. 49 U.S.C. §§31309 and 31313. This agreement incorporates any previous grant agreements and amendments that obligated funds and were executed by the Parties between September 1, 2006 and the execution of this agreement regarding the operation and maintenance of CDLIS.

### ARTICLE 2. Dates

The project period for CDLIS modernization began on September 1, 2006, which is the first day of the first month following the issuance of the first grant to AAMVA, as contemplated in the CDLIS Modernization Plan published in the Federal Register on May 2, 2006. The project period shall continue for such time as the Recipient is designated as Operator of CDLIS. The Recipient shall be designated as the Operator of CDLIS as long as it meets all of its responsibilities pursuant to this Agreement.

The Recipient and FMCSA shall agree upon a timeline for the phases of the CDLIS Modernization Plan, with the intention that all States will implement the modernized CDLIS software by December 31, 2010. The timeline shall be adjusted from time to time based on actual funds appropriated and other needs identified during the course of implementation of the CDLIS Modernization Plan.

### ARTICLE 3. Project Description

AAMVA shall continue to operate the current CDLIS and AAMVA shall ensure that the modernized CDLIS:

a. Complies with industry standards and with applicable Federal information technology security standards is required in Article 6;
b. Provides for the electronic exchange of all information including the posting of convictions;
c. Contains self-auditing features to ensure that data is being posted correctly and consistently by the States; and
d. Integrates the CDL and the medical certificate.

**ARTICLE 4. Driver's Privacy Protection Act of 1994, as amended**

AAMVA shall ensure that CDLIS is operated in accordance with the Driver's Privacy Protection Act of 1994, as amended, 18 U.S.C. §2721 et seq.

**ARTICLE 5. State Compliance with Commercial Driver's License Program**

To support and enhance State compliance, AAMVA shall ensure that CDLIS is operated in accordance with the regulations on State Compliance with Commercial Driver's License Program (49 C.F.R. Part 384).

**ARTICLE 6. Information Technology Security Standards**

**ARTICLE 6** is guided by 49 USC §31106 and all other applicable Federal Standards. The Federal Security Standards were amended after the Effective Date of this Agreement. The Federal Security Standards in effect in March 2013 follow:

AAMVA shall ensure that CDLIS is operated in accordance with the following Federal information security and privacy requirements but are not limited to as they may be amended from time to time during the term of this agreement: Federal Information Security Management Act of 2002 (FISMA), 44 U.S.C. §3541, et seq, National Institute of Standards and Technology (NIST) Guidelines; the E-Government Act of 2002 and the Privacy Act of 1974. AAMVA shall utilize the applicable documents from the 800-Series of Special Publications and the Federal Information Processing Standards (FIPS) from the National Institute of Standards and Technology in the development of the modernized CDLIS, or operation of the current CDLIS. AAMVA may consult with the FMCSA Information Security Officer and the FMCSA Privacy Officer for guidance on the applicability of these and other publications in these series not herein identified.

A. Additionally AAMVA shall ensure the following:
   a. Assign Responsibility for Security and Privacy. Assign responsibility for privacy and security of the system to a management official knowledgeable in the nature of the information and process supported by the application and in the management, personnel, operational, and technical controls used to protect it. This official shall assure that effective privacy and security products and techniques are appropriately used in the application and shall be contacted when a security or privacy incident occurs concerning the application.
   b. System Security Plan. Plan for adequate security for CDLIS system as part of AAMVA's information resources management (IRM) planning process. The security plan shall be consistent with guidance issued by the National Institute of Standards and Technology (NIST).
   c. Rules of the System. Establish a set of rules of behavior concerning use of, security in, and the acceptable level of risk for, the system. The rules shall be based on the needs of the various users of the system. The security required by the rules shall be only as stringent as necessary to provide adequate security for information in the system. Such rules shall clearly delineate responsibilities and expected behavior of all individuals with

access to the system. They shall include appropriate limits on interconnections to other systems and shall define service provision and restoration priorities. They shall also include guidance about appropriate safeguards to protect the confidentiality of personally identifiable information. Finally, they shall be clear about the consequences of behavior not consistent with the rules.

d. Training. Ensure that all individuals are appropriately trained in how to fulfill their security responsibilities before allowing them access to the system. Such training shall assure that employees are versed in the rules of the system, be consistent with guidance issued by NIST, and apprise them about available assistance and technical security products and techniques. Behavior consistent with the rules of the system and periodic refresher training shall be required for continued access to the system.
e. Specialized Training. Before allowing individuals access to the application, ensure that all individuals receive specialized training focused on their responsibilities and the application rules. This may be in addition to the training required for access the system. Such training may vary from a notification at the time of access (e.g., for members of the public using an information retrieval application) to formal training (e.g., for an employee that works with the application).
f. Personnel Controls. Screen individuals who are authorized to bypass significant technical and operational security controls of the system commensurate with the risk and magnitude of harm they could cause. Such screening shall occur prior to an individual being authorized to bypass controls and periodically thereafter. Incorporate controls such as separation of duties, least privilege and individual accountability into the application and application rules as appropriate.
g. Incident Response Capability. Ensure that there is a capability to provide help to users when a security or privacy incident occurs in the system and to share information concerning common vulnerabilities and threats. This capability shall share information with other organizations involved, consistent with NIST coordination, and should assist the agency in pursuing appropriate legal action, consistent with existing requirements. Privacy Incidents should be reported within one hour of discovery or detection to the FMCSA Information Security Officer at (202)493-0196 or FMCSASecurity@dot.gov.
h. Continuity of Support. Establish and periodically test the capability to continue providing service based upon the needs and priorities of the participants of the system in the event of failure of its automated support.
i. Technical Security. Ensure that cost-effective security products and techniques are appropriately used within the system. Ensure that appropriate security controls are specified, designed into, tested, and accepted in the application in accordance with appropriate guidance issued by NIST.
j. Information Sharing. Ensure that information shared from the application is protected appropriately, comparable to the protection provided when information is within the application.
k. System Interconnection. Obtain written management authorization, based upon the acceptance of risk to the system, prior to connecting with other systems. Where connection is authorized, controls shall be established which are consistent with the rules of the system and in accordance with guidance from NIST and other relevant requirements.

l. Public Access Controls. Where an application promotes or permits public access, additional security controls shall be added to protect the integrity of the application and the confidence the public has in the application. Such controls shall include segregating information made directly accessible to the public from official agency records.
m. Review of Security Controls. Perform an independent review or audit of the security controls in the system when significant modifications are made to the system, but at least every three years. The scope and frequency of the review should be commensurate with the acceptable level of risk for the system. Depending on the potential risk and magnitude of harm that could occur, consider identifying a deficiency pursuant to OMB Circular No. A-123, "Management Accountability and Control" and the Federal Managers' Financial Integrity Act (FMFIA), if there is no assignment of security responsibility, no security plan, or no authorization to process for a system.
n. Authorize Processing. Ensure that a management official authorizes in writing the use of the system based on an independent review or audit of the security controls implemented in the system before beginning or significantly changing processing in the system.. A complete copy of the authorization package will be provided to FMCSA IT Security Team for review, comment and recommendation. Use of the system shall be re-authorized at least every three years. The Parties agree that AAMVA will permit FMCSA IT Security Team to conduct periodic security self-assessment of the CDLIS central site. FMCSA will assess the security posture of the CDLIS yearly by completing the self-assessment referred to above. Each assessment will examine the managerial, technical, and operational controls of the CDLIS central component. AAMVA will implement the recommendations made by FMCSA resulting from each security and privacy assessment and review.
o. Review of Application Controls. Perform an independent review or audit of the security controls in each application at least every three years. Consider identifying a deficiency pursuant to OMB Circular No. A-123, "Management Accountability and Control" and the Federal Managers' Financial Integrity Act if there is no assignment of responsibility for security, no security plan, or no authorization to process for the application.
p. Authorize Processing. Ensure that a management official authorizes in writing use of the application by confirming that its security plan as implemented adequately secures the application. Results of the most recent review or audit of controls shall be a factor in management authorizations. The application must be authorized prior to operating and re-authorized at least every three years thereafter. Management authorization implies accepting the risk of each system used by the application.

B. Treatment of Personally Identifiable Information (PII)

AAMVA shall ensure all sensitive and Personally Identifiable Information (PII) has been identified on the CDLIS, and that effective safeguards are deployed to protect against its unauthorized disclosure in accordance with all current Federal and State privacy protection requirements during the course of this agreement.

C. Privacy Act Applicability

DOT has determined that CDLIS is not a Federal "system of records," as defined by the Privacy Act of 1974 (5 U.S.C. §552a), because the records in CDLIS are not controlled by DOT. Federal agencies obtaining access to CDLIS records may be subject to the Privacy Act, if they establish a

system of records with the information obtained from CDLIS. Such agencies may also need to provide a process for review and correction of those records. Prior to sharing CDLIS records with any Federal agency, other than FMCSA, AAMVA shall ensure that the agency has the appropriate Privacy Act measures in place, if applicable, regarding the collection, maintenance, dissemination and use of CDLIS records.

**ARTICLE 7. Availability of Information**

**ARTICLE 7** is guided by 49 USC § 31106 and all other applicable Federal Standards. The Federal Security Standards were amended after the Effective Date of this Agreement. The Federal Security Standards in Effect in March 2013 follow:

Upon request, AAMVA shall make available to the following designated entities information in the system as follows:

a. To a State authorized official as required to carry out the responsibilities under the Commercial Driver's License Program: information on all driver records but only as it relates to a particular official State task or function;
b. To FMCSA: all information on all driver records, including non-CDL holders who operate CMVs.
c. To third party service providers: access to CDLIS Central Site master pointer records only for the purpose of locating a commercial driver's State of record after the third party service provider has entered into an agreement with AAMVA and either (i) has received a copy of the signed written consent from the driver for release of the information pertaining to that driver or (ii) has entered into a written agreement with the party requesting CDLIS Central Site master pointer records requiring that it will not request CDLIS Central Site master pointer records for a driver unless and until it has received a copy of the written consent from the driver for release of the information pertaining to that driver. AAMVA or its authorized representative will conduct an annual review with each third party service provider to ensure that the provider is receiving and maintaining records of the written consent or of the written assurances from requesting parties that such parties have received the required written consent from the driver whose CDLIS information is being sought. These signed written consent forms must be retained for a period of 3years. In conducting these reviews of third party service providers, AAMVA or its authorized representative may utilize a reasonable sampling methodology in accordance with procedures approved in advance by FMCSA.

**ARTICLE 8. CDLIS Program Income**

A. Existing CDLIS System
The Parties agree that the Recipient shall retain program income earned as the result of operating the existing CDLIS provided that the Recipient shall use the retained program income to operate and maintain the existing CDLIS without funding from FMCSA to include all eligible activities associated with the following functions:

a. Maintain the network, hardware, and software needed for the sending and receiving of messages between the CDLIS Central Site and all of the jurisdictions;
b. Provide assistance to States when problems occur with messages between States;

c. Maintain a problem reporting system to track known problems and the resolution of the problem, and check progress of State resolution quarterly;
d. Provide information on problems to FMCSA quarterly (after contacting the State to determine progress fixing problem); and,
e. Create Structured Tests (A basic test, and specific tests for changes like MCSIA and Rail Road Highway Grade Crossing) conducted to ensure that a State's programming changes meet written specifications, the State is able to transmit and receive messages, and the State's system will not negatively impact other States or the CDLIS Central Site.

B. Modernized CDLIS System

The Parties agree that CDLIS Modernization Program Income shall be that income earned by the Recipient beginning on the first day of the first month (February 1, 2011) during which the new modernized CDLIS central site is operational and continuing thereafter as long as AAMVA is the FMCSA designated operator of CDLIS. The Parties agree that the Recipient shall retain CDLIS Modernization Program Income, provided that the Recipient shall operate and maintain the existing CDLIS (in accordance with subsection A of this Article) and fund future modernization efforts without funding from the FMCSA, to include all eligible activities associated with the following functions:

a. Maintain the network, hardware, and software needed for the sending and receiving of messages including the additional information required by SAFETEA-LU, between the CDLIS Central Site and all of the jurisdictions;
b. Provide assistance to States when problems occur with messages between States;
c. Maintain a problem reporting system to track known problems and the resolution of the problem, and check progress of State resolution quarterly;
d. Provide information on problems to the FMCSA quarterly (after contacting the State to determine progress made on fixing the problem);
e. Create Structured Tests (A basic test, and specific tests as may be required by program and system changes);
f. Perform Structured Testing with States (The basic test is to be performed at least once every 3 years. The basic test will be included with the specific tests, if it has been over 2 years since a State completed the basic testing);
g. Maintain documentation: State Procedures Manual, AAMVA Code Dictionary (ACD) Manual (uniform conviction and withdrawal codes), CDLIS System Specifications (or other documents that are created to support CDLIS), and Unified Network Interface (UNI) documentation as it applies to CDLIS;
h. Provide training on CDLIS Documentation: State Procedures Manual, ACD Manual, CDLIS System Specifications and implementation documents;
i. Provide training on UNI documentation as it applies to CDLIS;
j. Maintain the CDLIS Central Site in accordance with Federal Security Standards as described in Article 6; and
k. Retain a portion of program income to establish a fund designated for future modernization efforts.

For purposes of this Agreement, "modernization" of CDLIS shall include modifications to incorporate future technological developments and improvements with respect to existing CDLIS functionalities on the date of this Agreement. AAMVA, through action of its Board of Directors, shall establish CDLIS fees at a level that is adequate to provide revenues adequate to fund anticipated costs of carrying out AAMVA's obligations under this Agreement.

The Parties agree that the following eligible activities may be funded by CDLIS Modernization Program Income:

l. Develop and implement digital imaging technologies to allow for the exchange of digital images between jurisdictions and better identify driver license applicants;
m. Operate and maintain the Interprovincial Record Exchange (IRE) communication bridge developed and implemented with Canadian Council of Motor Transport Administrators (CCMTA) to enable U.S. and Canadian jurisdictions to exchange driver status data on commercial vehicle operators interactively; and
n. Other activities related to CDLIS and other federal transportation program objectives jointly approved by the AAMVA and FMCSA.

C. Annual Report of Prospective Use of Program Income
AAMVA shall provide an annual financial report to FMCSA regarding: the total expenditures of money by AAMVA on activities as described in Article 8(B)(a)-(q) and forecasting the use of Program Income in the upcoming 12-month period. The reporting period shall be October 1 to September 30 and the report shall be due no later than October 1 of each 12-month period.

D. Quarterly Report of Program Income
AAMVA shall provide a financial report within six months of the execution of this agreement regarding the total revenues and expenditures of program income by AAMVA since August 31, 2006 to June 30, 2008. Thereafter, AAMVA shall provide a quarterly financial report to FMCSA regarding the total revenues and expenditures of the program income by AAMVA on activities as described in Article 8(B)(a)-(q). The reporting period shall be January 1 to March 31; April 1 to June 30; July 1 Sept 30 and October 1 to December 31. Each report shall be due no later than 60 calendar days of the last day of the quarter. In addition, AAMVA will provide the audited financial report for each fiscal year (October 1 to September 30) no later than January 31 of the following fiscal year.

E. Annual Fiscal Management Review
The parties will meet annually to review AAMVA's level of effort devoted to each eligible activity, address future modernization requirements and efforts, and identify and agree on any required funding levels for ongoing activities and future modernization efforts.

**ARTICLE 9. Allowability of Costs**

The costs of Federal financial assistance performed or administered by nonprofit organizations are determined by the provisions of OMB Circular A-122 (relocated to 2 C.F.R. Part 230).

**ARTICLE 10. Indirect Costs**

In order for indirect costs to be chargeable to this Agreement, the Recipient must first establish an appropriate indirect cost rate. FMCSA will accept any current indirect cost rate or allocation plan previously approved for Recipient by a cognizant Federal agency. The Recipient is responsible for ensuring that independent audits are conducted in accordance with the existing Federal auditing and reporting standards set forth in OMB Circular A-133. The audit report must be submitted to FMCSA to support any future indirect cost proposals. This Indirect Costs provision does not operate to waive the limitations on Federal funding provided in this document. The Recipient's audited final indirect costs are allowable only insofar as they do not cause the Recipient to exceed the total program costs.

**ARTICLE 11. Budget Revisions/Reallocation of Amounts**

The Recipient must obtain prior written approval from the FMCSA Agreement Officer (AO) to transfer amounts budgeted for indirect costs to absorb increases in direct costs, or vice versa. The Recipient must also obtain prior written approval from the FMCSA AO to transfer amounts budgeted for direct cost categories when the cumulative value of such transfers will exceed 10% of the value of the Federal share of this Agreement. When requesting such approval, a written request suffices.

**ARTICLE 12. Intellectual Property Rights**

The Recipient shall make available to FMCSA copies of all work developed in performance with this agreement, including but not limited to software and data. FMCSA and others acting on its behalf shall have unlimited rights to obtain, reproduce, publish or otherwise use the data, software and other work developed in the performance of this Agreement pursuant to 49 C.F.R. §19.36.

Recipient retains ownership of system data and the software comprising CDLIS. Pursuant to 35 U.S.C. §202, FMCSA hereby reserves a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States any subject invention throughout the world.

**ARTICLE 13. Acknowledgment of Support and Disclaimer**

FMCSA retains license rights to all developed software and documentation under this Agreement in the event the Recipient is unable to continue supporting the functionality of this software. A procedure for ensuring the availability of the software source code and accompanying documentation shall be worked out as one of the early requirements of this Agreement. FMCSA will not make this source code available to any other source without the approval of the Recipient unless the Recipient ceases to support this software for any reason.

**ARTICLE 14. Site Visits**

FMCSA, through its authorized representatives, has the right, at all reasonable times, to make site visits to review project accomplishments and management control systems and to provide such technical assistance as may be required. If any site visit is made by the FMCSA on the premises of the Recipient or a sub-grantee or third party contractor or subcontractor under this Agreement, the Recipient shall provide and shall require these entities to provide all reasonable facilities and assistance for the safety and convenience of FMCSA representatives in the performance of their duties. All site visits and evaluations shall be performed in such a manner as will not unduly delay work.

**ARTICLE 15. Section 508 of the Rehabilitation Act**

All electronic and information technology (EIT) products rendered under this Agreement shall comply with Section 508 of the Rehabilitation Act and the Access Board Standards (36 C.F.R. Part 1194) and Guidelines, available for viewing at http://www.section 508.gov. Unless otherwise indicated, the Recipient represents by signature on this Agreement that all EIT products developed under this Agreement comply with the Access Board standards.

**ARTICLE 16. Special Requirements of the Agreement**

A. Non-Endorsement Statement
An acknowledgement of FMCSA support and a disclaimer of endorsement must appear in any publication of any material, whether copyrighted or not, based on or developed under this Agreement in the following terms:

> "This material is based upon work supported by the U.S. Department of Transportation/Federal Motor Carrier Safety Administration under Operation, Management, Administration, and Modernization Cooperative Agreement. Any opinions, findings, conclusions or recommendations expressed in this publication are those of the Author(s) and do not necessarily reflect the view of the U.S. Department of Transportation."

B. Reprints of Publications
At such time as any article resulting from work under this Agreement is published in a scientific, technical, or professional journal or publication, two reprints of the publication shall be sent to the AO, clearly referenced with the Agreement Number and other appropriate identifying information.

## ARTICLE 17. AO and Agreement Officer's Technical Representative (AOTR)

The AO may designate an AOTR to assist in monitoring the work under this Agreement. If appointed, the AOTR will oversee the technical administration of this Agreement and act as technical liaison with the performing organization. The AOTR is not authorized to change this Agreement, to make any commitments or otherwise obligate the FMCSA or authorize any changes which affect the agreement funding schedule or other terms or conditions.

The AO is the only individual who can legally commit or obligate FMCSA for the expenditure of public funds. The technical administration of this agreement shall not be construed to authorize the revision of the terms and conditions of performance.

## ARTICLE 18. Reimbursements and Project Administration

The Recipient's claims for reimbursement for expenses incurred under this project are made on Standard Form 270, Request for Advance Reimbursement. The Recipient shall designate the official(s) responsible for submitting and certifying vouchers, and the official(s) designated shall submit his/her signature(s) to FMCSA, CDL Division. The CDL Division will maintain the signatures on file. The designated Recipient official must sign the Standard Form 270. Reimbursements will be made using Electronic Funds Transfer to an account designated by Recipient.

The FMCSA CDL Division is responsible for ensuring costs incurred are eligible, allowable, reasonable, and authorized by the grant agreement. Advance payments are not authorized. Requests for reimbursement should be submitted to:

U.S. Department of Transportation
Federal Motor Carrier Safety Administration
ATTN: Selden Fritschner, Chief, CDL Division (MC-ESL)
1200 New Jersey Avenue, S.E.
W65-332
Washington, D.C. 20590

## ARTICLE 19. Reporting Requirements and Schedule

A. Submission of Reports
The Recipient shall submit two copies (one to the AO and one to the AOTR) of all required reports, invoices and documents, under transmittal letter referencing the Agreement number, as follows:

Submit one copy to the Agreement Officer at the following address:

> U.S. Department of Transportation
> Federal Motor Carrier Safety Administration
> 1200 New Jersey Avenue, S.E. W65-316
> Washington, D. C. 20590

ATTN: Name, AO

Submit one copy to the Agreement Officer's Technical Representative at the following address:

U.S. Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Avenue, S.E. W65-332
Washington, D.C. 20590
ATTN: Selden Fritschner

B. Report Format and Content
The Recipient should submit the following:

| ITEM | APPROXIMATE DUE DATE |
|---|---|
| Monthly Project Status Report | 15th of the month |
| Executive Steering Committee Report | Prior to the Executive Steering Committee Meeting |
| Request for Advance Reimbursement (SF 270) | Submitted as part of each invoice |
| Contract-to-Date financial Summary | Submitted as part of each invoice |
| Detail Invoice Report by task | Submitted as part of each invoice |
| Project Status Reports regarding the status of each ongoing Task by Phase under this Agreement. The Quarterly Executive Steering Committee Report should suffice to meet this requirement. It should consist of a narrative-type description of activities conducted during the reporting period. Each report will set forth concise statements covering activities relevant to this Agreement and will include:<br>Accomplishments to date, including percentage of completion for each phase.<br>Identification of work to be accomplished during the next reporting period.<br>Identification of any problems encountered that would affect the completion of the work within the time and money constraints as set forth in this Agreement, together with recommended solutions to such problems.<br>Estimated cost shown in the proposal for the current Phase, including FMCSA and AAMVA shares.<br>Total expended to date, including percentage of monies spent to date. | On a quarterly basis |

| | |
|---|---|
| Current and cumulative costs expended versus scheduled costs, including cost share. | |

C. Submission of Notices

All notices to be given under the terms of this Agreement shall be deemed given when delivered in person or by private courier service.

If to Recipient:

Neil D. Schuster
President and Chief Executive Officer
American Association of Motor Vehicle Administrators
4301 Wilson Boulevard, Suite 400
Arlington, VA 22203

If to FMCSA:

U.S. Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Avenue, S.E.
MC-ESL W65-332
Washington, D. C. 20590
ATTN: Selden Fritschner

**ARTICLE 20. Travel and Per Diem**

Travel requirements under this Agreement shall be met using the most economical form of transportation available. If economy class transportation is not available, Recipient must submit a written justification for use of higher class travel indicating dates, times, and flight numbers.

**ARTICLE 21. Financial Management System**

Within 30 days after the Effective Date of this Agreement as specified in Article 24, the Recipient is required to implement a financial management system adequate for monitoring the accumulation of costs and revenue and in accordance with the financial management system requirements of generally accepted accounting principles (GAAP) as prescribed in Accounting Principles Board Opinions and other related materials issued by the American Institute of Certified Public Accountants.

**ARTICLE 22. Governing Regulations**

A. Federal Standards

All applicable Federal Statutes and regulations guide this Agreement. This Agreement is not intended to conflict with current laws, regulations, Executive Orders, Federal Security Standards, or DOT directives. If any term of this Agreement is inconsistent with such authority, then the

term shall be invalid, but the remaining terms and conditions of this Agreement shall remain in full force and effect.

B. Administrative Requirements

The Parties to this Agreement acknowledge that their performance shall be governed by and in compliance with "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and other Non-profit Organizations," 2 C.F.R. Part 215; 49 C.F.R Part 19), and any other Federal laws and regulations that may be applicable.

C. Execution in Counterparts

This Agreement may be executed in two or more fully or partially executed counterparts each of which shall be deemed an original binding the signer thereof against the other signing party, but all counterparts together shall constitute one and the same instrument.

**ARTICLE 23. Amendments**

Any amendments to this Agreement must be made in writing, signed by all parties and specifically referred to as an amendment to this Agreement.

**ARTICLE 24. Effective Date**

By their signatures below, the Parties agree to incorporate supplemental language into the June 9, 2008 CDLIS Operation, Management, Administration, and Modernization Cooperative Agreement. The Effective Date of this CDLIS Operation, Management, Administration, and Modernization Cooperative Agreement remains June 9, 2008.

**ARTICLE 25. Transition and/or Termination Plan**

A. Termination.

a. <u>Termination by Mutual Agreement</u>. At any time during the term of this Agreement, the parties may, by written agreement, terminate the status of AAMVA as the Operator of CDLIS under this Agreement on such terms as both parties agree.

b. <u>Termination for Cause</u>. Either party may issue a Notice of Termination under this Agreement upon a material breach by the other party upon 180 days prior written notice, unless the defaulting party cures such breach within such period, or, if the breach is one that is curable but requires more than 180 days to cure, develops a plan to cure such breach within a mutually agreeable and reasonable period of time and diligently proceeds according to such plan until the breach is cured.

c. <u>Termination by FMCSA without Cause</u>. At any time during the term of this Agreement FMCSA may issue a Notice of Termination with respect to the appointment of AAMVA as the Operator of CDLIS if FMCSA determines that a termination is in the interest of FMCSA. FMCSA shall terminate by delivering a Notice of Termination to AAMVA.

d. Termination by AAMVA without Cause. AAMVA may at any time during the Term of this Agreement issue to FMCSA a Notice of Termination.

B. Obligations of the Parties following the Issuance of a Notice of Termination. Except as otherwise agreed by the parties in writing, the parties agree that following the issuance of a Notice of Termination in accordance with this Agreement, they shall have the following obligations:

a. On the first business day of the month immediately following the month in which a Notice of Termination is issued there shall begin an 18-month Transition Period during which the parties shall act in accordance with the provisions of this Article 25 to effectuate the orderly transfer of the obligations of the CDLIS Operator from AAMVA to another organization specified by FMCSA in accordance with this Agreement.
b. Following the issuance of a Notice of Termination, all provisions of this Agreement shall remain in full force and effect until the last business day of the 18th month of the Transition Period, at which time the obligations of the parties under this Agreement, except as otherwise provided in this Agreement, shall terminate.
c. At all times following the issuance of a Notice of Termination the parties shall cooperate in good faith toward the end of accomplishing the transfer of CDLIS Operator responsibilities.
d. On or before 60 days following the beginning of the Transition Period FMCSA shall designate in writing a successor CDLIS Operator ("Successor Operator") and shall enter into a written agreement with AAMVA under which FMCSA shall provide fair and equitable compensation to AAMVA for all work (and associated reasonable expenses incurred) to accomplish the orderly transfer of CDLIS Operator obligations to the Successor Operator. The Transition Period automatically shall be extended by the number of days of any delay in the designation of a successor CDLIS Operator beyond the foregoing 60-day deadline. The existence of such an agreement shall be a condition precedent to AAMVA's obligation to provide services not otherwise within the scope of its duties as CDLIS Operator.
e. On or before 90 days following the beginning of the Transition Period, FMCSA, AAMVA and the Successor Operator shall agree on a detailed plan ("Transition Plan") that provides for the orderly transition of responsibilities as CDLIS Operator from AAMVA to the Successor Operator. The Transition Period automatically shall be extended by the number of days of any delay in the agreement on a Transition Plan beyond the foregoing 90-day deadline.

**ARTICLE 26. CDLIS as State-to-State Platform**

AAMVA agrees not to perform actions that will supersede or interfere with the authority of the Secretary of Transportation to establish and operate motor carrier, commercial motor vehicle, and driver information systems and data analysis programs as required under the provisions of 49

U.S.C. §§ 31106 and 31309. The Department of Transportation shall be notified of any system changes that affect the system as it relates to motor carriers, commercial motor vehicle, and commercial driver's licenses.

In accordance with the Bayh-Dole Act, as amended by the Technology Transfer Commercialization Act of 2000 (P.L. 106-404), agreements AAMVA enters into with third parties shall not supersede or interfere with the Department of Transportation's royalty-free, nonexclusive and irrevocable license to obtain, reproduce, publish, or otherwise use the Commercial motor vehicle information systems platform and authorize others to do so for federal purposes. 35 U.S.C. § 202.

**ARTICLE 27. Program Financial Audit**

AAMVA agrees to complete an independent financial statement audit of CDLIS as mutually agreed upon by both Parties. AAMVA agrees to provide the results of the audit to FMCSA and provide corrective action plans, if necessary, to FMCSA for approval.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

By: ______________________

William A. Quade
Associate Administrator for Enforcement and Program Delivery

Date: 3/18/13

AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS

By: ______________________

Neil D. Schuster
President and Chief Executive Officer
American Association of Motor Vehicle Administrators
Date: 3.20.13

# COMMERCIAL DRIVER'S LICENSE INFORMATION SYSTEM (CDLIS)

## FIRST ADDENDUM TO THE OPERATION, MANAGEMENT, ADMINISTRATION AND MODERNIZATION COOPERATIVE AGREEMENT

### BACKGROUND

On June 9, 2008 the Federal Motor Carrier Safety Administration (FMCSA) and the American Administration of Motor Vehicle Administrators, a District of Columbia nonprofit corporation (AAMVA) entered into an Operation, Management, Administration and Modernization Cooperative Agreement. Among other things, that agreement set forth the terms and conditions under which AAMVA would continue to serve as the operator of the Commercial Driver's License program and carry out a modernization of the Commercial Driver's License Information System (CDLIS).

In March 2013 FMCSA and AAMVA agreed to supplement the June 9, 2008 Operation, Management, Administration and Modernization Cooperative Agreement to address, among other things, the intervening completion of the modernization of CDLIS. The March 2013 Operation, Management, Administration and Modernization Cooperative Agreement is referred to herein as the "2013 Agreement." This First Addendum to the 2013 Agreement is referred to herein as the "First Addendum."

FMCSA and AAMVA desire to amend the 2013 Agreement as provided below.

### AGREEMENTS

NOW, THEREFORE, the Parties hereby agree as follows:

1. Unless otherwise specified, all capitalized terms in this First Addendum shall have the same meaning as ascribed to such terms in the 2013 Agreement.

2. FMCSA and AAMVA hereby agree that as of the date on which the last party signs this First Addendum, Article 7 of the 2013 Agreement shall be amended to read as follows:

> **ARTICLE** 7 is guided by 49 USC § 31106 and all other applicable Federal Standards. The Federal Security Standards were amended after the Effective Date of this Agreement. The Federal Security Standards in Effect in March 2013 follow:
>
> Upon request, AAMVA shall make available to the following designated entities information in the system as follows:

a. To a State authorized official as required to carry out the responsibilities under the Commercial Driver's License Program: information on all driver records but only as it relates to a particular official State task or function;
b. To FMCSA: all information on all driver records, including non-CDL holders who operate CMVs.
c. To third party service providers: access to CDLIS Central Site master pointer records only for the purpose of locating a commercial driver's State of record after the third party service provider has entered into an agreement with AAMVA and either (i) has received a copy of the signed written consent from the driver for release of the information pertaining to that driver or (ii) has entered into a written agreement with the party requesting CDLIS Central Site master pointer records requiring that it will not request CDLIS Central Site master pointer records for a driver unless and until it has obtained the driver's consent (evidenced in accordance with standards approved in advance by FMCSA) for release of the information pertaining to that driver. AAMVA or its authorized representative will conduct an annual review with each third party service provider to ensure that the provider is receiving and maintaining records of each driver's consent and of the written assurances from requesting parties that such parties have received the required prior consent from the driver whose CDLIS information is being sought. Documentation evidencing consent must be retained for a period of 3 years. In conducting these reviews of third party service providers, AAMVA or its authorized representative may utilize a reasonable sampling methodology in accordance with procedures approved in advance by FMCSA.

3. Except as expressly provided in this First Addendum, all provisions of the 2013Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this First Addendum to be executed and delivered as of the date and year written above.

| **FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION** | **AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS** |
|---|---|
| By: WILLIAM AMBROSE QUADE III Digitally signed by WILLIAM AMBROSE QUADE III Date: 2018.10.18 09:55:25 -04'00' | By: Anne Ferro Digitally signed by Anne Ferro DN: dc=ad, dc=aamva, ou=User Accounts, ou=Staff, cn=Anne Ferro, email=AFerro@aamva.org Date: 2018.10.16 07:33:02 -04'00' |
| ____________________ [print name] | Anne S. Ferro |
| ____________________ [print title] | President and Chief Executive Officer |
| Date: ____________, 2018 | Date: ____________, 2018 |

101118

**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-2547 |

**DECLARATION OF THOMAS J. LIBERATORE**

Pursuant to 28 U.S.C. § 1746, I, Thomas J. Liberatore, declare and state as follows:

1. I am the Acting Associate Administrator in the Office of Safety at the Federal Motor Carrier Safety Administration ("FMCSA" or "Agency"), an operating administration of the U.S. Department of Transportation.

2. As Acting Associate Administrator for Safety, I support FMCSA's mission of reducing crashes, fatalities, and injuries involving large trucks and buses. I oversee FMCSA's safety operations, including all Division Offices, Service Centers, and Headquarters safety and enforcement operations. FMCSA's Headquarters safety and enforcement operations is comprised of the Office of Enforcement and Compliance and Office of Safety Programs, which includes the Commercial Driver's License ("CDL") Division. The CDL Division works to develop, maintain, and enforce standards for testing and ensuring the fitness of commercial motor vehicle drivers and, in coordination with the American Association of Motor Vehicle Administrators ("AAMVA") and the States, works to ensure the Commercial Driver's License Information System ("CDLIS") is operated in accordance with applicable Federal laws and regulations.

3. In my official capacity, I have access to FMCSA records reflecting its oversight of CDLIS, as well as the development, maintenance, and enforcement of CDL standards. I have access to the information referenced herein. As such, I am fully familiar with the facts set forth in this declaration.

**CDLIS Cooperative Agreements**

4. Section 12007(c) of the Commercial Motor Vehicle Safety Act of 1986, as amended, (Public Law 99-570, 100 Stat. 3207, October 27, 1986) (" CMVSA") directed the Secretary to establish an information system, now known as CDLIS, to serve as a clearinghouse and depository of information about the licensing, identification, and disqualification of operators of commercial motor vehicles. 49 U.S.C. § 31309.

5. In 1988, the Federal Highway Administration, FMCSA's predecessor agency, entered into a Designation Agreement (1988 CDLIS Agreement) pursuant to 49 U.S.C. § 31309 with AAMVA and its former affiliate AAMVAnet, Inc. to establish a communications network to implement CDLIS. The agreement designated AAMVAnet the CDLIS operator.[1] The Motor Carrier Safety Improvement Act of 1999, Public Law 106-159, § 106(b), 113 Stat. 1748, transferred the agreement from the Federal Highway Administration to FMCSA.

6. In 2008, FMCSA and AAMVA entered into a Cooperative Agreement regarding the operation, management, administration, and modernization of CDLIS (2008 CDLIS Agreement). Among other things, the 2008 Agreement set forth the terms and conditions under which AAMVA would continue to serve as the manager, administrator, and operator of CDLIS and carry out its modernization. The 2008 CDLIS Agreement was executed under the authority of 49 U.S.C. § 31309.

[1] In 2002, AAMVAnet, Inc. was merged into AAMVA. Accordingly, AAMVAnet, Inc. no longer exists as a separate corporation.

7. In an agreement signed on March 20, 2013, FMCSA and AAMVA agreed to supplement the 2008 CDLIS Agreement to address, among other things, the intervening completion of the modernization of CDLIS. The 2008 CDLIS Agreement, as supplemented by the March 20, 2013 agreement and three addendums dated October 16, 2018, June 13, 2022, and September 30, 2023, is referred to as the "2013 CDLIS Agreement." The 2013 CDLIS Agreement was executed under the authority of 49 U.S.C. § 31309. A true and correct copy of the portions of the 2013 CDLIS Agreement relevant to this litigation—the March 20, 2013 agreement and October 16, 2018 addendum—are attached to the Federal Defendants' opposition brief as "Exhibit A"

8. Section 7(b) of the 2013 CDLIS Agreement states that "Upon request, AAMVA shall make available…" "[t]o FMCSA: all information on all driver records, including non-CDL holders who operate [commercial motor vehicles]."

**FMCSA's Oversight of State Non-Domiciled CDL Issuance Practices**

9. The CMVSA, as amended, mandated that the Secretary of Transportation establish and enforce uniform, minimum federal standards for State CDL programs for testing and ensuring the fitness of commercial drivers. 49 U.S.C. § 31301 *et seq*. This authority was delegated to FMCSA. 49 U.S.C. § 113(f); 49 CFR 1.87(e). FMCSA does not issue CDLs or Commercial Learner's Permits ("CLPs") to drivers.

10. The CMVSA, as amended, established performance standards with which State CDL programs must comply to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. § 31314 and to avoid CDL program decertification under 49 U.S.C. § 31312. 49 U.S.C. § 31311(a).

11. FMCSA's safety mandate requires the Agency to ensure that each State issues CDLs to the same rigorous safety standards. As part of its oversight obligations, FMCSA conducts comprehensive Annual Program Reviews for each State CDL program in accordance

with 49 CFR 384.307 to verify that the CDL programs are in substantial compliance with the requirements of 49 U.S.C. § 31311(a) and its implementing regulations in 49 CFR Part 383 and Part 384, Subpart B.

12. States are authorized to issue CDLs and CLPs to individuals who are not domiciled in their State, but if they choose to issue non-domiciled CDLs or CLPs, they must do so in accordance with regulations prescribed by FMCSA. 49 U.S.C. § 31311(a)(12)(B)(ii). State CDL programs are also required to enforce federal CDL and CLP standards. 49 U.S.C. § 31301 *et seq*.

13. Executive Order 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers," directed FMCSA to "review non-domiciled [CDLs] issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take appropriate actions to improve the effectiveness of current protocols…." 90 Fed. Reg. 18759 (Apr. 28, 2025). Accordingly, as part of the 2025 Annual Program Reviews, FMCSA conducted an in-depth review of State procedures and policies in issuing non-domiciled CLPs and CDLs.

14. FMCSA's 2025 Annual Program Reviews uncovered evidence of systemic, nationwide regulatory non-compliance by States in the issuance of non-domiciled CLPs and CDLs, identifying more than 30 states that failed to adhere to non-domiciled CDL regulations. This breakdown resulted in tens of thousands of improperly issued CDLs, highlighted by error rates of 53 percent in New York, 49 percent in Texas, and 25 percent in California. Further, the 2025 Annual Program Reviews also uncovered evidence that some States have issued non-compliant standard CDLs because they failed to comply with the Federal regulatory framework.

15. Accordingly, FMCSA issued Preliminary Determination of Noncompliance letters to 25 States, including California and New York, which also received Final Determinations of Substantial Noncompliance.[2]

**Need for the Requested CDLIS Data**

16. To support FMSCA's statutorily-mandated oversight of State CDL programs, FMCSA provided a letter to AAMVA on June 25, 2026, requesting information for all individual pointers within CDLIS for the last five years in accordance with Article 7(b) of the 2013 CDLIS Agreement. Compl., Exh. 1, ECF 1-2 at 2. In a subsequent letter to AAMVA, FMCSA explained that the Agency would use the CDLIS data as part of FMCSA's ongoing statutory and regulatory oversight efforts to ensure the integrity and issuance of CDLs. *Id*. at 5. In a letter to AAMVA, dated July 24, 2026, the Agency reiterated that, "FMCSA intends to use [the] data to execute its statutory and regulatory mandates under 49 U.S.C. Chapters 311 and 313, including verifying [CDL] validity and conducting motor carrier assessments." *Id*. at 9.

17. Obtaining the requested CDLIS data will aid FMCSA's continuous monitoring of State non-domiciled and standard CLP and CDL issuance practices to ensure they are complying with 49 CFR Part 383 and 49 CFR Part 384, Subpart B. FMCSA intends to use the data to ensure that States issue CLPs and CDLs to drivers who are qualified, properly trained, and do not pose significant safety risk, and to assess whether significant safety incidents were caused by drivers who were improperly issued a CLP or CDL. Without the requested CDLIS data, FMCSA will be hindered in its statutory obligation to oversee State CDL issuance and ensure national compliance and uniformity.

---

[2] Preliminary determinations of noncompliance and the final determination of substantial noncompliance for California are available at https://www.regulations.gov/docket/FMCSA-2025-0622/document.

18. FMCSA is unable to obtain the full set of data from CDLIS through other means. Though FMCSA can make bulk queries of CDLIS data, doing so requires that FMCSA input a driver's license number for each of the driver records FMCSA seeks to obtain. Because CDLs are issued by States, FMCSA does not have a list of corresponding numbers for each CDL in CDLIS and thus cannot perform a bulk query that would capture all relevant records.

19. Furthermore, obtaining the requested CDLIS data supports FMCSA's on-going efforts to comply with Executive Order 14286, which explicitly directed FMCSA to "review non-domiciled [CDLs] issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities…." FMCSA's centralized access to the requested CDLIS data will facilitate the Agency's review of State non-domiciled and standard CDL issuance records, assist the Agency in assessing instances and improper CDL issuance and determining whether such noncompliant practices are widespread, help the Agency evaluate the efficacy of Federal oversight, and support the Agency's efforts to ensure that every driver permitted to operate an 80,000-pound commercial motor vehicle on the Nation's roadways is properly verified, tested, licensed, and qualified.

20. Consequently, obtaining the requested CDLIS data is critical for FMCSA to verify regulatory compliance, correct systemic errors, and fulfill its statutory duty to protect the traveling public.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 17, 2026, at Washington, D.C.

THOMAS JOSEPH LIBERATORE

Digitally signed by THOMAS JOSEPH LIBERATORE
Date: 2026.08.17 12:29:13 -04'00'

By: ________________________________

Thomas J. Liberatore
Acting Associate Administrator for Safety
Federal Motor Carrier Safety Administration
U.S. Department of Transportation

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>Plaintiffs',<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>Defendants. | ) | 1:26-cv-2547 (AJT-IDD) |

**ORDER**

Before the Court is an Emergency Motion for a Temporary Restraining Order, filed by twenty-one states and the District of Columbia, which requests an order temporarily enjoining Defendant the American Association of Motor Vehicle Administrator (the AAMVA") from transferring into the custody of the Defendants Federal Motor Carrier Safety Administration (FMCSA) and the Department of Transportation ("DOT") (collectively, other than the AAMVA, the "Federal Defendants") its database containing limited but highly personalized information pertaining to over 17 million persons who have obtained Commercial Drivers Licenses ("CDLs"), which the Federal Defendants do not control, which are owned by the states that provided that information, and which would continue to be available to the Federal Defendants, as it has been, based on specific individualized requests, and also enjoining the Federal Defendants from imposing any adverse actions or sanctions in the event such data is not produced as demanded [Doc. No. 2] (the "Motion"). The Federal Defendants have opposed the Motion. [Doc. No. 45].[1] The parties have fully briefed the issues raised in the Motion and the

[1] Defendant AAMVA has also filed a response to the Motion separate from that filed by the Federal Defendants, in which the AAMVA "takes no view on most of those legal issues," and "seeks only to comply with State and federal law while maintaining the safety critical functionality of the CDLIS clearinghouse." [Doc. No. 46] at 1.

Court held a hearing on August 20, 2026. For the reasons stated herein, the Motion is **GRANTED.**

## I. BACKGROUND

Several weeks ago, the FMCSA requested that the AAMVA—a nonprofit that holds its records on behalf of the States—turn over the 17 million records in its database (the Data Demand). When AAMVA did not immediately comply with the Data Demand, the Department of Homeland Security (DHS) issued a subpoena for the same records, claiming that it needed them for immigration enforcement. At first, AAMVA told the federal government that it would produce the records to FMCSA, at which point DHS withdrew its subpoena. But after nearly two dozen States objected that this disclosure would breach their contracts with AAMVA, violate their laws, and violate federal law, AAMVA informed FMCSA that it was considering an opt-out mechanism under which it would produce only the records of those States that did not object to their production. DHS then issued a new subpoena for the records and on August 11, 2026,[2] FMCSA presented Defendant AAMVA with the ultimatum that it turn over the database by August 17, 2026, or face immediate termination of all of AAMVA's federal funding, including approximately $10 million that funds the database itself. *See* [Doc. No. 1-2] (letters between FMCSA and AAMVA concerning data request). On August 13, 2026, the Court, finding that it needed additional time and briefing to consider the Motion, entered an "administrative stay" that directed that the AAMVA not provide the requested data and that the Federal Defendants not take any adverse action against the AAMVA in order to maintain the status quo until the Court could further consider the Motion with the benefit of a hearing and the response of the Federal Defendants. [Doc. No. 25].

---

[2] The letter issued on August 11, 2026 from Chief Counsel for the FMCSA to the AAMVA, [Doc. No. 1-2] at 21–22, is herein described as the "August 11 letter."

In their Complaint, the Plaintiff States bring seven causes of action alleging the following: (1) the Data Demand is contrary to law under the Administrative Procedure Act ("the APA") because it violates the Commercial Motor Vehicle Safety Act ("CMVSA"), the Driver's Privacy Protection Act ("DPPA"), and the Privacy Act (Counts I, II, III, IV); (2) the Data Demand is arbitrary and capricious under the APA (Count V); (3) the Data Demand violates the Spending Clause of the Constitution (Count VI); and (4) the Data Demand breaches the contracts the AAMVA has with Illinois, California, Maine, and the District of Columbia (Count VII). [Doc. No. 1]

## II. LEGAL STANDARD

In order to obtain a temporary restraining order, a plaintiff must show (1) likelihood of success on the merits; (2) irreparable harm in the absence of injunctive relief; (3) that the balance of equities tip in the plaintiff's favor; and (4) that the issuance of preliminary injunctive relief is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) ("The standard for granting either a TRO or a preliminary injunction is the same." (citation omitted)). The balance of equities and public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Preliminary injunctive relief is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).

## III. DISCUSSION

### A. Legal Framework

In 1986, Congress determined that the absence of an efficient means for States to share information about CDL holders had led to "the practice of multiple license use by commercial drivers," which allowed them to "spread their traffic violations over a number of licenses, and

maintain a 'good driver' rating regardless of the number of violations." S. Rep. No. 99-570, at 3 (1986). To remedy this problem, Congress enacted the CMVSA, in which it directed the Secretary of Transportation to "maintain an information system," known as the Commercial Driver's License Information System ("CDLIS"), that serves "as a clearinghouse and depository of information pertaining to the licensing and identification of operators of commercial motor vehicles and the disqualification of such operators from operating commercial motor vehicles." 49 U.S.C. §§ 31309(a), (d). The CMVSA provides that "[t]he Secretary shall consult with the States in carrying out this section." *Id.* § 31309(a).

The Secretary is authorized to maintain this database either directly or through a third-party "authorized operator." *Id.* § 31309(d). Since 1988, the Secretary has designated AAMVA, a nonprofit member association composed of motor vehicle administrators in every State and territory, to serve as CDLIS's only authorized operator. *See* 76 Fed. Reg. 68328, 68329 (Nov. 4, 2011).

States must participate in CDLIS as a condition of receiving up to eight percent of formula based federal highway funds. 49 U.S.C. § 31314(c). Each participating State must make available through CDLIS records containing personally identifying information about every CDL holder in the State, as well as every person disqualified from holding a CDL or whose CDL has been revoked, suspended, or canceled. *Id.* §§ 31311(a)(5), (7)–(8), (23). Those records—known as "master pointer records," or MPRs—consist of an individual's name, date of birth, Social Security number (SSN) (or a non-SSN with an indicator that the number is an SSN alternative), sex, driver's license number, and the State of Record. *Id.* § 31309(b). The states, however, retain exclusively the detailed information pertaining to the actual issuance of a CDL, including the individual's qualifications. *Id.* § 31311(a)(6).

In sum, CDLIS, which AAMVA maintains, is a pointer system: it identifies the State maintaining the driver's underlying record and facilitates access to that State-held record, rather than serving as the repository of the driver's complete history. [Doc. No. 46] at 6. The CDLIS Central Site is thus distinct from the full driver record that is maintained by the States and exchanged between jurisdictions. *Id.* Though highly sensitive personal information, the information at the CDLIS Central Site is therefore limited and allows both the states and FMCSA to submit a query through its infrastructure to access the MPR and identify which jurisdiction maintains an individual's complete driver record and to retrieve the full driver record from that state jurisdiction. *Id.*

The CMVSA directs the Secretary to develop an information policy and ensure that information in CDLIS "shall be made available and subject to review and correction in accordance" with that policy. 49 U.S.C. § 31309(c). DOT has developed such a policy, issued on January 13, 2005, which explicitly states that that "the records in CDLIS are not controlled by FMCSA." 70 Fed. Reg. 2454, 2455 (Jan. 13, 2005). A subsequent policy statement issued on May 18, 2026, states that the MPR records belong to the states, not the federal government. 91 Fed. Reg. 28514, 28517 (May 18, 2026) (describing the MPRs as "owned by each state."). The January 13, 2005 policy also reiterates that there are only four entities authorized to access information from CDLIS: "the Secretary of Transportation, the States, an employer or prospective employer of a person who operates a commercial motor vehicle (CMV), and a person who operates a CMV for an employer that owns or leases a CMV or assigns employees to operate a CMV." 70 Fed. Reg. at 2455. Reflecting the highly sensitive and protected nature of the CDLI, under the Policy, other federal agencies may "request access to information" only upon a required showing in accordance

with a designated procedure within the FMCSA and upon executing a "Memorandum of Understanding" with either DOT or FMCSA. *Id.*

B. Jurisdiction

As an initial matter, the Court concludes it has jurisdiction over the claims in this action. The FMCSA's unequivocal demand that the AAMVA turn over 17 million records constitutes "final agency action" because it (1) "mark[s] the consummation of the agency's decisionmaking process" and is not "tentative or interlocutory"; and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). In that regard, the August 11 letter from the FMCA, the last communication to the AAMVA, states in unequivocal terms its demand for transfer of the database, stating that AAMVA's decision to submit the decision to produce the requested records to its Board is "unacceptable," and leaves DOT with "no choice but to take immediate action to secure the production of the requested pointer records." [Doc. No. 1-2] at 21. As a result, the letter states in no uncertain terms that that "[u]nless AAMVA provides DOT with the requested records by August 17, DOT *will* pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena, and considering terminating its contract with AAMVA." *Id.* (emphasis added).

As reflected in these exchanges between the AAMVA and FMCSA, FMCSA's demand for transfer of the database and its threatened action of terminating federal grants if the database is not transferred is "not dependent on future uncertainties or intervening agency rulings," but "clean-cut and concrete," *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019). Indeed, the only contingency that is stopping the FMCSA from acting on its promise to terminate federal funds

is the AAMVA declining, as it has stated it intends to do, to produce all the records the FMCSA initially requested.

Likewise, "legal consequences will flow" from that demand. *Bennett*, 520 U.S. at 178. No matter how AAMVA acts, either FMCSA will terminate AAMVA's contracts and funding, thereby disabling the CDLIS and preventing the States from issuing or renewing CDLs to any of their residents, or AAMVA will transfer 17 million State-owned records to federal custody. In sum, AAMVA is effectively "compel[led]" to take one of the above actions. *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). These are "legal consequences" by any measure.

The Court also concludes that the Hobbs Act, 28 U.S.C. § 2342(3)(A), does not preclude this Court's exercise of jurisdiction, as the Federal Defendants contend. As the D.C. Circuit has previously recognized, a "final agency action" under 5 U.S.C. § 704 of the APA does not necessarily render it a "final order" under § 2342(3) of the Hobbs Act that would subject the decision to the exclusive jurisdiction of the Court of Appeals. *Weaver v. FMCSA*, 744 F.3d 142, 146 (D.C. Cir. 2014). And the only "final agency action" under the Hobbs Act that places exclusive jurisdiction in the Court of Appeals is final agency action under § 2342(7), which does not apply to the FMCSA's demands and threats. Here, the August 11 letter constitutes neither a rule nor a regulation that would subject the challenge to the Court of Appeals' exclusive jurisdiction under 28 U.S.C. § 2342(3)(A) or (7). Nor did the FMCSA, in issuing the Data Demand, engage in any kind of adjudication or "compile[] a record with an eye toward judicial review" that would make the August 11 letter a "final order." *Weaver*, 744 F.3d at 147.

Finally, Plaintiff States have the required statutory standing to assert their challenges based on the DPPA and the Privacy Act as the interests of Plaintiff States who seek to protect the data of

their citizens clearly fall within the zone of interests to be protected by the DPPA, whose purpose is "protect[] an individual's right to privacy" in motor vehicle records, *Maracich v. Spears*, 570 U.S. 48, 60–61 (2013), and the Privacy Act whose purpose is to "safeguard[] for an individual privacy against Government invasion." *F.A.A. v. Cooper*, 566 U.S. 284, 295 (2012); *Carlson v. People of State of Cal.*, 310 U.S. 106, 113 (1940) ("The power and duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents cannot be doubted.").

For these reasons, the Court has jurisdiction to adjudicate the claims raised in the Motion.

C. Likelihood of Success of Plaintiffs' Claims

With respect to the merits of the Plaintiff States' claims, the core issue in this case is whether the FMCSA is entitled to have transferred to it, and in effect take custody and control, of the AAMCA's highly restricted and protected database that consists of state-provided information. As stated in the DOT's policy statements pertaining to the CDLIS, those records are not controlled by the FMCSA and belong to the states.

1. APA Claims

The Court concludes the Plaintiffs are likely to succeed on the merits of their APA claims that the FMCSA's demand for the wholesale transfer of the CDLIS database, and threatened sanctions, violates the CMVSA and is contrary to the DPPA and the Privacy Act.

Reflecting the protected status of the information transferred from the states to the CDLIS, established and maintained by the AMMVA, Section 31309(a) of the CMVSA requires that the Secretary of Transportation "maintain an information system . . . that will serve as a clearinghouse and depository of information about the licensing, identification, and disqualification of operators of commercial motor vehicles," and "consult with the States in carrying out this section." 49

U.S.C. § 31309(a). The Federal Defendants have invoked Section 31309(a) as a basis for their Data Demand, *see, e.g.*, [Doc. No. 1-2] at 21, and do not dispute that they failed to consult the States before issuing the Data Demand that seeks the transfer to them of 17 million records. Nevertheless, they contend that no consultation was required because their demands and threatened sanctions are not sufficiently related to carrying out that section to trigger the consultation requirement. But the Federal Defendants' actions contravene the very premise of the CMVSA, and its implementing regulations, which make clear that the States will provide highly sensitive information under certain protections, including the retention of ownership, and that they play a central role in CDLIS's design and operation, including the exclusive power to add, delete, or alter the records they have contributed. [Doc. No. 3] at 5. The FMCSA has never before requested any information on the scale reflected in the Data Demand or threatened sanctions for non-compliance, all of which clearly reflect a change in policy and practice with respect to carrying out the CMVSA that requires consultation with the states; and given the Federal Defendants' lack of control or ownership over the requested data, the Federal Defendants cannot, in effect, unilaterally replace the AAMCA with the FMCSA as the depository for CDLIS.

As to the DPPA, the Federal Defendants have failed to articulate how their obtaining the Data is authorized by one of the four enumerated exceptions in 18 USC 2721(b) that authorize disclosing or making available the highly restricted personal information contained in the Data Demand. The government use exception, which the Federal Defendants rely upon, authorizes disclosure "[f]or use by any government agency . . . in carrying out its functions." 18 U.S.C. § 2721(b)(1). The FMCSA states that it "intends to use this data to execute its statutory safety and regulatory mandates," [Doc. No. 1-2] at 9, without explaining how it would actually assist in that effort, particularly when it has ostensibly carried out those functions for decades

without such a bulk transfer based on its recognized abilities to already access specific MPRs and access state records directly through program reviews. Indeed, when repeatedly pressed at the hearing on this point, the Federal Defendants were unable to explain how the data would in fact assist them in performing their statutory functions, or point to anything that they cannot already do without this data, and conceded in their briefing, that the FMCSA has already been performing detailed safety and regulatory reviews authorized by the CMVSA through its annual program reviews and audits on the state-maintained records that contain the needed detailed information concerning the issuance and validity of state-issued CDLs. *See* [Doc. No. 45] at 21. The FMCSA has also conceded it has not demanded the MPRs solely to use those records itself, but also to share them with DHS for "immigration enforcement purpose[s]." [Doc. No. 1-2] at 14. But the relied upon exception under the DPP A that authorizes disclosure of protected data to effectuate FMCSA's own statutory mandate does not authorize FMCSA to simply pass that data onto another agency.

Finally, with respect to the Privacy Act, the Court finds that the Plaintiff States are likely to succeed on their claims that the Data Demand (1) violates the Privacy Act's notice requirements that FMCSA must satisfy before ingesting new data into a new or newly modified "system of records," (2) violates restrictions on what information FMCSA may maintain into such a system, and (3) violates prohibitions against disclosing personal information to third parties, including other federal agencies such as DHS.

The Court also concludes that Plaintiff States are likely to succeed on their claim that the Data Demand in the August 11 letter is arbitrary and capricious. In that regard, under the APA, an agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). An action is arbitrary and capricious if the agency "'failed to consider . . . important aspects of the problem'" or weigh relevant "alternatives." *Dep't Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25, 33 (2020) (quoting *State Farm Mut. Auto. Ins.*, 463 U.S. at 43). In addition, when an agency changes policy, it must "display awareness that it is changing position," "provide a reasoned explanation for the change," and consider any "serious reliance interests" engendered by its prior policy. *FDA v. Wages & White Lion Invests., LLC*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). And an agency may not provide a justification for a policy that is "pretextual." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

The explanations contained in its letters to the AAMVA state that the FMCSA seeks the information to "conduct routine reviews and data analysis to oversee the national CDL program," to carry out its "statutory safety and regulatory mandates" under its governing statutes, and "to help prevent fatal trucking accidents involving the many drivers to whom States have improperly issued Commercial Driver's Licenses." [Doc. No. 1-2] at 9, 21. These generic statements, coupled with the Federal Defendants' inability to explain how this data is needed to accomplish their goals, do not explain why or how the bulk transfer of MPRs for the first time in AAMCA or FMCSA's history is rationally related to their stated goals. Nor does the letter evidence consideration of "important aspects of the problem," including the costs and potential harms of disclosing the sensitive personal information of 17 million individuals as well as the reliance interests in having this data kept private. In the absence of any substantive explanation for how the requested data transfer is related to FMCSA's performing its statutory purpose, the Federal Defendants have failed to dispel the compelling inference that they seek these 17 million files in large part, if not primarily, for immigration enforcement, which is not part of its statutory mandate.

For all these reasons, the Court concludes that the Plaintiffs are likely to succeed on their APA Claims.

2. Spending Clause Claim

The Court also concludes that the Plaintiff States are likely to succeed on their claim that the Data Demand, with its threatened sanctions, violates the Spending Clause of the Constitution, which requires that any condition on federal funding be imposed through "clear notice" of the condition it intended to impose.

49 USC § 31309(c) provides that "[i]nformation in the information system shall be made available and subject to review and correction in accordance with" a policy developed by the Secretary, 49 U.S.C. § 31309(c). Even if the Secretary could establish a policy entitling him to demand custody of the States' records, the policy that FMCSA has promulgated under Section 31309(c) nowhere mentions such an entitlement. To the contrary, it explicitly states that "the records in CDLIS are *not* controlled by FMCSA." 70 Fed. Reg. 2454, 2455 (Jan. 13, 2005) (emphasis added) with an understanding by the States that only they, and neither the AAMVA nor the FMSCA, have the authority to add, delete, or change its own records maintained in CDLIS. *See, e.g.*, [Doc. No. 3-2] ¶ 13. The only right of access it grants to other agencies is through a detailed written request for "access to," not custody of, "information in CDLIS." 70 Fed. Reg. at 2455. And because this policy must "be consistent with existing Federal information laws," 49 U.S.C. § 31106(e)(1), it cannot (and does not purport to) supersede the limits on disclosure in the DPPA or the Privacy Act. Moreover, the character of CDLIS as a clearinghouse that is intended to allow States to exchange with one another information owned by the States themselves reinforces the conclusion that the States did not knowingly or voluntarily agree to have all of their records transferred over to FMCSA by accepting federal highway funds.

For these reasons, the Plaintiff States are also likely to succeed on their Spending Clause claim because the Federal Defendants have failed to identify any "clear notice" to the states that a condition for receiving federal funding was the States' willingness to let FMCSA take custody of the highly sensitive personal information provided to AAMVA.

3. Contract Claims

The Court also concludes that the Contract Plaintiffs (Illinois, California, Maine, and the District of Columbia) are likely to succeed on the merits of their contract claims against AAMVA. Each of these states have entered into contracts with the AAMVA to restrict what AAMVA may do with the State's proprietary and confidential driver information. The Federal Defendants take no position on these claims and Defendant AAMVA indeed acknowledges that complying with FMCSA's Data Demand "could breach these contractual obligations [with the States], especially given that nearly two dozen . . . States have objected to AAMVA's sharing their data." [Doc. No. 46] at 11.

D. <u>Irreparable Harm</u>

The Plaintiff States have also made a clear showing of irreparable harm in the absence of injunctive relief. Courts have often found that the unauthorized disclosures of information provided to agencies, particularly those involving a large-scale disclosure of sensitive information, constitute irreparable harm. For example, in *Roberts v. Austin*, the Fifth Circuit reversed district court a finding of no irreparable harm from release of SNAP data), 632 F.2d 1202, 1214 (5th Cir. 1980), and in *Airbnb, Inc. v. City of New York*, the Southern District of New York observed that "the disclosure of private, confidential information is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (citation modified)). Moreover, the 17 million records at issue here, the overwhelming

portion of which no doubt includes data on U.S. citizens, will not be disclosed to a small number of individuals with confidentiality obligations. FMCSA has provided no confidentiality assurances and openly admits that it intends to share the records with DHS so that it can be used for immigration enforcement, among other things. Such large scale and unregulated distribution inevitably compromises and undermines the public's trust in the Plaintiff States' promises to safeguard its residents' personal information.

In addition, neither the Federal Defendants nor the AAMVA appear to seriously dispute the severe harms that are likely to be inflicted on the Plaintiff States if FMCSA carries out its threats, including a total cessation of CDL issuance and renewal, with dire economic and safety related consequences. Instead, the Federal Defendants argue that Plaintiff States' harm as too "speculative" because they only threatened to cancel AAMVA's contract and cut off its funding but "have not [actually] done so." [Doc. No. 45] at 30. Since the purpose of a TRO is to prevent "imminent harm," and the Federal Defendants have clearly threatened to cut off federal funding, the standard for granting a TRO is readily satisfied.

E. Equities and Public Interest

The equities and the public interest also favor enjoining the Data Demand. The Federal Defendants contend that entering an injunction would undermine equitable and public interests because it would disrupt their ability to ensure the integrity of CDLs. [Doc. No. 45] at 31. But, as stated earlier, the Federal Defendants have been unable to explain how precisely the limited but highly sensitive personal information would assist them in that regard. This contention is also hard to square with the fact that the FMCSA has fulfilled its statutory obligations for decades without the demanded transfer of data. Indeed, as the Federal Defendants acknowledge, they already can run CDLIS queries and regularly conduct state audits to root out State noncompliance with CDL

regulations, and they cite to no change in circumstances that prevents them from carrying out their duties when they were previously able to do so through such program reviews and by accessing pointer records in CDLIS with specific individualized requests. Finally, because the Data Demand is unlawful, the public interest inherently favors issuing an injunction. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "substantial public interest in having governmental agencies abide by the federal laws" (citation modified)).

The issuance of an injunction is also in the public interest given the harm the termination of federal funding to AAMVA would cause since CDLIS would effectively cease its operations and impair Plaintiff States' ability to issue and renew CDLs and compromise the safe operation of commercial motor vehicles. *See, e.g.*, [Doc. No. 3-7] ¶¶ 34–37. Furthermore, as the AAMVA contends, the "CDLIS . . . is interconnected with all forms of driver licensing" and therefore any shutdown "could disrupt, or even stop, the issuance and renewal of any driver license in the United States." [Doc. No. 46] at 13.

## IV. CONCLUSION

For all of the above reasons, the Plaintiff States' Motion is **GRANTED** pending the Court's consideration and ruling on a motion for a preliminary injunction, and until that time, it is hereby

**ORDERED** that the administrative stay previously entered, [Doc. No. 25], be, and the same hereby is, **VACATED**; and it is further

**ORDERED** that the Defendant AAMVA, its officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them, be, and the same hereby are, **ENJOINED** from transferring Plaintiff States' CDLIS Master Pointer Records, as requested in the Data Demand, to the Federal Defendants or any other agency; and it is further

**ORDERED** that the Federal Defendants, their officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them, be, and the same hereby are, **ENJOINED**, from taking any adverse actions against the Plaintiff States or the AAMVA based on the failure to transfer to them the requested information in the Data Demand including, without limitation, terminating or threatening to terminate AAMVA's federal contracts or funding, terminating or threatening to terminate Plaintiff States' federal contracts or funding, or taking any other action that could impair the operation of CDLIS or Plaintiff States' ability to issue commercial driver's licenses; and it is further

**ORDERED** that the Plaintiff States are **DIRECTED** to file any motion for a preliminary injunction on or before August 27, 2026; and the Defendants file their response to any such motion on or before September 3, 2026, and the Court will hold a hearing on September 10, 2026 at 10:00 a.m. in Courtroom 900. In any briefing on a motion for a preliminary injunction, the parties are permitted to incorporate, by reference, the briefing filed in connection with the TRO Motion and the arguments made at the hearing on the TRO Motion; and it is further

**ORDERED** that no security is required to be posted by the Plaintiff States pursuant to Fed. R. Civ. P. 65.

The Clerk is directed to forward a copy of this Order to all counsel of the record.

August 20, 2026
Alexandria, Virginia

/s/
Anthony J. Trenga
Senior United States District Judge

**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-2547 |

**<u>SECOND DECLARATION OF THOMAS J. LIBERATORE</u>**

Pursuant to 28 U.S.C. § 1746, I, Thomas J. Liberatore, declare and state as follows:

1. I am the Acting Associate Administrator in the Office of Safety at the Federal Motor Carrier Safety Administration ("FMCSA" or "Agency"), an operating administration of the U.S. Department of Transportation ("DOT"). I previously signed and submitted a declaration in this case, *see* ECF No. 45-2, and I incorporate by reference the information discussed therein.

2. As Acting Associate Administrator for Safety, I support FMCSA's mission of reducing crashes, fatalities, and injuries involving large trucks and buses. I oversee FMCSA's safety operations, including all Division Offices, Service Centers, and Headquarters safety and enforcement operations. FMCSA's Headquarters safety and enforcement operations is comprised of the Office of Enforcement and Compliance and Office of Safety Programs, which includes the Commercial Driver's License ("CDL") Division. The CDL Division works to develop, maintain, and enforce standards for testing and ensuring the fitness of commercial motor vehicle drivers and, in coordination with the American Association of Motor Vehicle Administrators

("AAMVA") and the States, works to ensure the Commercial Driver's License Information System ("CDLIS") is operated in accordance with applicable Federal laws and regulations.

3. In my official capacity, I have access to FMCSA records reflecting its oversight of CDLIS, as well as the development, maintenance, and enforcement of CDL standards. I have access to the information referenced herein. As such, I am fully familiar with the facts set forth in this declaration, which were considered by the agency when it issued the August 11 Letter to AAMVA.

**How FMCSA Plans to Use the Requested CDLIS Data**

4. To support FMSCA's statutorily-mandated oversight of State CDL programs, FMCSA sent a letter to AAMVA on June 25, 2026, requesting information for all individual pointers within CDLIS for the last five years in accordance with Article 7(b) of the 2013 CDLIS Agreement. Compl., Ex. 1, ECF 1-2 at 2. In a subsequent letter to AAMVA, FMCSA explained that the Agency would use the CDLIS data as part of FMCSA's ongoing statutory and regulatory oversight efforts to ensure the integrity and issuance of CDLs. *Id*. at 5. In a letter to AAMVA, dated July 24, 2026, the Agency reiterated that, "FMCSA intends to use [the] data to execute its statutory and regulatory mandates under 49 U.S.C. Chapters 311 and 313, including verifying [CDL] validity and conducting motor carrier assessments." *Id*. at 9.

5. The requested CDLIS pointer data includes driver name, date of birth, State of record, license number, and social security number, if available. In most cases, the CDLIS data requested will include partial social security numbers.

6. The requested CDLIS pointer data will serve many of FMCSA's purposes, including investigation and enforcement activities, collection of civil penalties, State

performance monitoring (particularly as it relates to the issuance of non-domiciled CDLs), and data analytics.

7. If the CDLIS data is furnished as requested, FMCSA intends to cross-reference it against existing driver information in the Agency's information and enforcement systems. Each category of data element requested will support FMCSA's oversight, analysis, and enforcement efforts as follows:

***Investigation and Enforcement***

8. The list of driver names, license numbers, States of record, dates of birth, and social security numbers will assist FMCSA in ensuring that the Agency has correctly identified individuals subject to investigation or enforcement.

9. In a population of millions of drivers, more identifying data will enable FMCSA to ensure it has identified the correct driver for intervention, especially when a driver has a common first or last name.

10. The requested data will also help FMCSA ensure positive identification of drivers who have multiple different names or multiple variations of the same name in FMCSA's or other government information systems.

11. Further, it will help FMCSA identify individuals who are trying to evade detection by providing false identity information.

***Collections***

12. Social security numbers (whether full or partial) belonging to commercial learner's permit ("CLP") and CDL drivers will assist FMCSA's enforcement efforts under 49 U.S.C. §§ 521, 5122, 5123, 14914 and 49 CFR Part 386.

13. For CLP and CDL holders who have defaulted on payment of monetary civil penalties assessed by FMCSA, the Agency can use the driver's full or partial social security number when initiating collection proceedings through the U.S. Department of Treasury.

14. Though FMCSA currently refers drivers in default to the Treasury Department for collection proceedings without social security numbers, including this information will make the collection process more efficient and help ensure proper identification. Such use of the driver's social security number is consistent with the Privacy Act.

***Performance Monitoring***

15. Due to the systemic, nationwide regulatory non-compliance by States in issuing non-domiciled CLPs and CDLs uncovered during the 2025 Annual Program Reviews, FMCSA intends to engage in ongoing performance monitoring of State CDL issuance practices to ensure compliance with Federal regulations, as contemplated by Executive Order 14286.

16. Given the volume of drivers who currently hold a CLP or CDL in the United States, monitoring State CDL issuance practices by performing a single query for each individual driver would require FMCSA personnel to perform millions of individual queries to obtain CDL issuance and expiration dates and other information about the driver and the licensing process.

17. The requested CDLIS data, however, will enable FMCSA to conduct batch queries for this information, which FMCSA may use to cross reference licensing information against other government information systems to ensure States are issuing CDLs to drivers who meet the eligibility requirements and that CDL expiration dates do not exceed the limitations set forth in 49 CFR 383.73.

18. Further, under FMCSA's current oversight practices, the Agency is wholly reliant on State-reported estimates to determine CDL driver populations because FMCSA does not have

the full set of CDLIS pointer data. Consequently, obtaining the requested CDLIS data is critical for FMCSA to utilize CDLIS's bulk query function and use that bulk data to verify regulatory compliance, correct systemic errors, and fulfill the Agency's statutory duty to protect the traveling public.

19. FMCSA intends to use the requested CDLIS data to ensure that States issue CLPs and CDLs to drivers who are qualified, properly trained, and do not pose significant safety risk, and to assess whether significant safety incidents were caused by drivers who were improperly issued a CLP or CDL. Without the requested CDLIS data, FMCSA will be hindered in its statutory obligation to oversee State CDL issuance and ensure national compliance and uniformity.

20. The requested CDLIS data will enable FMCSA to engage in continuous performance monitoring of:

a. State non-domiciled and standard CLP and CDL issuance practices to ensure they are complying with 49 CFR Part 383 and 49 CFR Part 384, Subpart B;

b. State compliance with the medical recordkeeping requirements set forth in 49 CFR 383.73(o) and ensure appropriate State connectivity with FMCSA's National Registry of Certified Medical Examiners;

c. State compliance with CLP and CDL issuance and downgrade requirements associated with FMCSA's Drug and Alcohol Clearinghouse (Clearinghouse) set forth in 49 CFR 383.73(a)(8), (b)(10), (c)(10), (d)(9), (e)(8), (f)(4), and (q), and ensure appropriate State connectivity with the Clearinghouse;

d. State compliance with regulations requiring the exclusive electronic exchange of driver history record information through CDLIS in 49 CFR 384.208(a) and 384.209(c); and

e. Entry-Level Driver Training Provider compliance with FMCSA's regulations set forth in 49 CFR Part 380, Subpart G.

***Data Analytics***

21. Conducting individual queries hampers FMCSA's ability to perform data analytics to support its programs.

22. For example, there were approximately 822,000 crashes involving commercial motor vehicles, including those that do not require a CDL (i.e., "non-CDL" commercial motor vehicles) from October 1, 2022, to July 31, 2026. Non-CDL commercial motor vehicles may be driven by CDL-holders and non-CDL holders. The crash data, reported to FMCSA by its State partners, does not identify whether the commercial motor vehicle driver involved holds a CDL. Consequently, for crashes that involve a commercial motor vehicle for which a CDL is not required, FMCSA must conduct an individual query to determine if the driver involved holds a CLP or CDL, which is an unnecessarily inefficient and time consuming process given the significant volume of crashes. By obtaining the requested CDLIS data, FMCSA will be able to conduct a bulk query for data about some, or all, of the drivers involved in the crashes to discern which drivers hold a CLP or CDL and, in turn, analyze that data to inform the Agency's safety policies and programs.

23. While FMCSA has conducted targeted more limited investigations and data analysis in the past without the ability to conduct bulks queries of CDLIS data, FMCSA intends to conduct broader oversight and data analysis concerning CDL issuance and testing, entry-level

driver training, and motor carrier use of CDL drivers. FMCSA's planned activities in this regard are aimed at addressing widespread State noncompliance with Federal regulations governing non-domiciled CDL issuance, CDL fraud, and CDL "mills" for domestic and foreign domiciled drivers attempting to obtain State-issued CDLs.

24. The ability to conduct bulk queries will alleviate many inefficiencies and permit FMCSA to better fulfill its statutory mandates. A bulk query using the drivers' license numbers would return a comprehensive spreadsheet that is ready for further analysis.

25. Because CDLs are issued by States, FMCSA does not have a list of corresponding numbers for each CDL in CDLIS and thus cannot perform a bulk query that would capture all relevant records.

26. Additionally, individual CDLIS query reports are returned as a PDF document. Consequently, without the requested data, FMCSA personnel would need to manually transfer the information returned in the PDF document to a separate spreadsheet for data analysis. Such a practice would be exceedingly inefficient, time consuming, and labor intensive.

27. Obtaining the requested CDLIS data will also enable FMCSA to assess motor carrier-employer compliance with certain Clearinghouse violation reporting requirements. Under current regulations, 49 CFR 382.705(b)(4), motor carrier employers are required to submit a violation report to the Clearinghouse when an employee-driver, who holds a CLP or CDL, is issued a citation for driving a commercial motor vehicle under the influence of alcohol or controlled substances (DUI in a CMV). At the present time, FMCSA is reliant on motor carrier-employers to submit the required violation reports, and the Agency has little insight into whether the reports are being submitted. By obtaining the requested CDLIS data, FMCSA will be able to

perform bulk queries to discern when convictions of DUI in a CMV occur to ensure that motor carrier-employers properly reported the citation issuance to the Clearinghouse at the outset.

28. In addition, obtaining the requested data will enable FMCSA to perform bulk queries to analyze violation trends and determine crash risk, which will help shape the direction of future rulemakings and enforcement policies.

29. Furthermore, obtaining the requested CDLIS data supports FMCSA's on-going efforts to comply with Executive Order 14286, which explicitly directed FMCSA to "review non-domiciled [CDLs] issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities…." FMCSA's centralized access to the requested CDLIS data will facilitate the Agency's review of State non-domiciled and standard CDL issuance records, assist the Agency in assessing instances and improper CDL issuance and determining whether such noncompliant practices are widespread, help the Agency evaluate the efficacy of Federal oversight, and support the Agency's efforts to ensure that every driver permitted to operate an 80,000-pound commercial motor vehicle on the Nation's roadways is properly verified, tested, licensed, and qualified.

30. Under DOT Order 8000.8A,[1] issued on November 20, 2020, as well as 5 U.S.C. § 406(a)(1), FMCSA is required to provide the DOT Office of Inspector General (OIG) timely access to all records and materials relevant to programs and operations for which OIG has investigative responsibilities. Accordingly, the requested CDLIS data may also be used to support OIG's criminal investigations.

31. Finally, obtaining the requested CDLIS data will help FMCSA properly allocate resources for oversight of CLP and CDL issuance among jurisdictions and assist in reporting

[1] DOT Order 8000.8A is available at https://www.transportation.gov/orders/office-inspector-general-investigative-responsibilities-0.

information to Congress about the scale of the national CDL program and budgetary needs to fulfill the Agency's statutory oversight mandate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 3, 2026, at Washington, D.C.

THOMAS JOSEPH LIBERATORE

Digitally signed by THOMAS JOSEPH LIBERATORE
Date: 2026.09.03 13:11:47 -04'00'

By: ______________________________

Thomas J. Liberatore
Acting Associate Administrator for Safety
Federal Motor Carrier Safety Administration
U.S. Department of Transportation

**IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-2547 |

## DECLARATION OF KEITH GRAHAM

Pursuant to 28 U.S.C. § 1746, I, Keith Graham, declare and state as follows:

1. I am the Chief Financial Officer (CFO) at the Federal Motor Carrier Safety Administration ("FMCSA" or "Agency"), an operating administration of the U.S. Department of Transportation.

2. As the CFO, I support FMCSA's mission of reducing crashes, fatalities, and injuries involving large trucks and buses by overseeing FMCSA's funding of all grants, contracts and cooperative agreements.

3. In my official capacity, I have access to FMCSA records related to the funding and oversight of contracts and grants to the American Association of Motor Vehicle Administrators (AAMVA) related to the Commercial Driver's License Information System (CDLIS). I have access to the information referenced herein. As such, I am fully familiar with the facts set forth in this declaration.

**CDLIS Contracts**

4. FMCSA currently has two active contracts with AAMVA. The total obligated amount of funding on these two contracts is $10,892,437.00 and the total value of both contracts (if all options are exercised) is $20,837,936.

5. The contracts fund federal users' access to CDLIS and operation and maintenance costs for CDLIS.

6. If FMCSA were to terminate the contracts with AAMVA, the Agency and Contracting Officer (CO) would first have to determine whether a termination would be proper as either a Termination for Convenience or Termination for Default under the Federal Acquisition Regulation (FAR).

7. Contracts may be terminated for the convenience of the government in accordance with FAR at 48 CFR Part 49, Subpart 49.5 if an Agency decides that continuing the contract is no longer in the best interest of the government. After termination for convenience, the contractor may file a claim against the government for allowable incurred costs, reasonable profit on work done and settlement/wind down costs. If the contractor and government cannot agree on the settlement proposal amount, the CO issues a unilateral determination, which the contractor can appeal for full compensation. A contractor may also challenge the termination itself (seeking breach of contract damages) under limited circumstances and may succeed if the contractor proves the government acted in bad faith or committed a clear abuse of discretion.

8. Contracts with the government may also be terminated for default, in accordance with FAR at 48 CFR Part 49, Subpart 49.4, due to contractor failure or breach, such as missed deadlines, non-conforming work, or failure to progress, for example. But prior to the termination for default, the CO must first issue an administrative Cure Notice (with a 10-day minimum) or an administrative show cause notice before terminating the contract.

9. To appeal a Contracting Officer's final decision regarding any termination, a contractor must file an appeal under the Contract Disputes Act (CDA) (41 U.S.C. §§ 7101–7109), with either the Civilian Board of Contract Appeals (CBCA) within 90 days of the Contracting Officer's final decision or the U.S. Court of Federal Claims (COFC) within 12 months of the Contracting Officer's final decision. When a contractor appeals a termination, the review tribunal—either the Civilian Board of Contract Appeals (CBCA) or the U.S. Court of Federal Claims (COFC)—reviews the case *de novo*.

**CDLIS Grants**

10. To support CDLIS, FMCSA currently has 18 open grants (awarded from Fiscal year 2023 to Fiscal Year 2026) with a total value of $21,281,980.

11. The grants provide funding to AAMVA under the CDL grant program (49 USC §31313) for enhancements, testing support, and training, among other projects.

12. If a grantee fails to comply with the U.S. Constitution, Federal statutes or regulations, or the terms and conditions of the grant, FMCSA may impose certain specific conditions on the grantee. 2 CFR § 200.339. Prior to imposing specific conditions, the Agency must provide the grantee with notice of, among other things, the reason why the specific condition(s) is being imposed, the nature of the action needed to remove the specific condition(s), and the method for requesting reconsideration of the imposition of the specific condition(s). *Id.* § 200.208(d).

13. If the Agency determines that the grantee's noncompliance cannot be remedied by imposing specific conditions, the Agency may take one or more of the following actions: (a) temporarily withholding payments until the grantee takes corrective action; (b) disallowing costs for all or part of the activity associated with the noncompliance; (c) suspending or terminating the grant in part or in its entirety; (d) initiating suspension or debarment proceedings; (e)

withholding further Federal funds for the project or program; or (f) pursuing other legally available remedies. 2 CFR § 200.339. Upon initiating a remedy for noncompliance, the Agency must provide the grantee with an opportunity to object and provide information challenging the action. *Id.* § 200.342.

14. Grants may also be terminated under federal award regulations (2 CFR § 200.340) and statutory oversight authority. Grant termination may be for cause or due to a shift in Agency priorities.

15. Before a grant may be terminated, the Agency must issue a formal written notification specifying the reason for termination, the effective date, and instructions for settling remaining allowable expenses. Under 2 CFR § 200.342, the Agency must provide an opportunity for appeal.

16. The person vested with the authority to issue a grant termination or other corrective action against a grantee is the Agency's Grant Officer, Thomas Martin, who reports to me as CFO. The August 11th letter which threatened grant termination was signed by the Agency's Chief Counsel, Rebecca Pettit, and not the Agency's Grant Officer, Thomas Martin.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 3, 2026, at Washington, D.C.

KEITH ANTHONY GRAHAM

Digitally signed by KEITH ANTHONY GRAHAM
Date: 2026.09.03 14:26:45 -04'00'

By: ______________________________
Keith Graham
Chief Financial Officer
Federal Motor Carrier Safety Administration
U.S. Department of Transportation

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>Defendants. | ) | 1:26-cv-2547 (AJT-IDD) |

**ORDER**

By order dated August 20, 2026, the Court issued a Temporary Restraining Order (the "TRO"), [Doc. No. 54], enjoining the Defendant American Association of Motor Vehicles Administrators ("AAMVA") from transferring to Defendants the Federal Motor Carrier Safety Administration (FMCSA) and the Department of Transportation (DOT) (the "Federal Defendants")[1] or any other agency "its database containing limited, but highly personalized, information pertaining to over 17 million persons who have obtained Commercial Drivers Licenses ("CDLs")," [the "Data Demand"], "which the Federal Defendants do not control, which are owned by the states that provided that information, and which would continue to be available to the Federal Defendants, as it has been, based on specific individualized requests, and also enjoining the Federal Defendants from imposing any adverse actions or sanctions in the event such data is not produced as demanded." *Id.* at 1.

On August 27, 2026, Plaintiffs filed a Motion for a Preliminary Injunction (the "PI

---

[1] Although the term "Federal Defendants" in the TRO also includes the Secretary of Transportation and the Administrator of FMCSA, the Court for ease of reference has used in this Order the term "Federal Defendants" to refer, without differentiating, both to all Defendants and also when only the Defendants DOT and FMCSA are being referenced.

Motion"), [Doc. No. 84], on which the Court held a hearing on September 10, 2026, following which it took the PI Motion under advisement.

The Federal Defendants have opposed the PI Motion on essentially the same grounds as they opposed the Emergency Motion for a Temporary Restraining Order, [Doc. No. 2], and while reasserting their previously filed opposition to the TRO have asked the Court to "revisit" certain specific aspects of its TRO in light of their additional arguments presented in opposition to the PI Motion, together with their newly filed declarations. More specifically, the Federal Defendants asked the Court to reconsider (1) whether the Court had jurisdiction, particularly in light of the Fourth Circuit's decision in *Jake's Fireworks Inc. v. United States Consumer Product Safety Commission*, 105 F.4th 627 (4th Cir. 2024), which the Federal Defendants contend is binding precedent that requires that this Court not exercise jurisdiction; (2) whether the Federal Defendants acted arbitrarily and capriciously with respect to its Data Demand based on its duty to consult, the Privacy Act of 1974, and the Driver's Privacy Protection Act ("DPPA"); (3) whether the Federal Defendants' Data Demand violated the Spending Clause; and (4) the scope of any injunctive relief. [Doc. No. 101]. The Federal Defendants do not present any new arguments with respect to the Court's reasoning and findings with respect to the Plaintiffs' contract claims or its findings concerning irreparable injury, the balance of equities, or the public interest, and relies in that regard upon the briefing and arguments made in connection with their opposition to the entry of the TRO.

Upon consideration of the PI Motion, the memoranda in support thereof and in opposition thereto, including the declarations submitted in connection therewith, and for the reasons stated in the TRO, which is incorporated herein by reference and made a part hereof, and the additional reasons stated below, including the findings of fact and conclusions of law contained therein, the Motion is **GRANTED**.

## I. The Court has Jurisdiction.

With respect to jurisdiction, the Court continues to conclude that for the purposes of exercising jurisdiction under the Administrative Procedure Act ("APA"), the Federal Defendants engaged in a "final agency action" that was not an "order" within the meaning of the Hobbs Act.

Under the APA, judicial review is permitted only for "final agency actions," and an agency action is final when it is both (1) "the consummation of the agency's decisionmaking process," and (2) one "from which legal consequences will flow." *Jake's Fireworks*, 105 F.4th at 631 (cleaned up) (quoting *U.S. Army Corps. Of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016)).

Here, by letter dated June 25, 2026, Defendants DOT and FMCSA, relying upon Article 7(b) of the 2013 Commercial Driver's License Information System ("CDLIS") Cooperative Agreement, made the Data Demand, viz., that AAMVA turn over records containing the name, date of birth, state of record, license number, and social security number of every driver in the entire CDLIS database going back five years, comprising approximately 17 million "master pointer records" ("MPRs"). [Doc. No. 1-2] at 2–3.

In its response by letter dated June 30, 2026, AAMVA raised concerns with the Data Demand, including that the relied upon Section 7(b) of the Cooperative Agreement "calls for access to 'driver records,' for authorized purposes, [which] FMCSA personnel may access . . . directly from the State of Record," and that the requested '"pointer records,' although built in large part from information in 'driver records,' are separate from driver records." *Id.* at 3. It also stated that:

> driver records are maintained by originating jurisdictions and merely accessed via the [CDLIS]. As stated in Section 6(C) of the Cooperative Agreement, they are not considered a federal system of records under the Privacy Act, 5 U.S.C. § 552a and the Department of Transportation's implementing regulations at 49 C.F.R. Part 10. By comparison, the data set presently requested seems likely to create a Privacy-Act-covered system of records.

*Id.* at 4. The AAMVA also requested that FMCSA (1) provide information regarding "the specific intended use of the information" and "what agency or agencies will use the information and for what government function or functions" and (2) "share [its] analysis of whether this dataset will be a federal system of records under the Privacy Act and provide us any pertinent system of records notice ("SORN")." *Id.* at 3–4.

By letter dated July 7, 2026, FMCSA responded to AAMVA's request for information. In that response, FMCSA did not identify a provision of the Commercial Motor Vehicle Safety Act ("CMVSA") supporting its use of the Data or identify a SORN applicable to the data, but stated broadly that it "will use the CDLIS data as part of [its] statutory and regulatory oversight in [its] ongoing efforts to ensure the integrity and issuance of [CDLs and CMVs]" and that it "will handle all legal coordination necessary under the Privacy Act . . . ." *Id.* at 5–6. Notably absent from this explanation of need in light of subsequent disclosures is any indication that the requested Data would be transferred to the Department of Homeland Security ("DHS") to be used in connection with immigration enforcement.

In response, AAMVA reiterated its DPPA and Privacy Act compliance concerns, including that member states have a "meaningful role under the federal Privacy Act when the source records are state records." *Id.* at 7–8. In its follow-up letter, dated July 24, 2026, FMCSA explained that (a) it "intend[ed] to use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313," (b) it was authorized to make "subsequent redisclosure[s] to federal partner agencies . . . provided the data is used strictly in furtherance of legitimate government functions," and (c) it would provide relevant SORNs "under separate cover." *Id.* at 9. In that letter, FMCSA did not identify particular agencies to which it intended to disclose the Data or functions for which such other agencies would use it; and there is no indication in the record that, to date,

FMCSA has provided any SORNs.

An exchange of letters and communications further ensued, and by letter dated July 24, 2026, AAMVA advised Defendants DOT and FMCSA that "AAMVA intends to disclose the records [requested in the Data Demand] in compliance with applicable law, mindful of our regulatory obligations and the rights of the data owners." *Id.* at 11.[2] In that regard, it summarized the restrictions on AAMVA's disclosure of the MPRs, including that several states restrict disclosure of social security numbers, many states restrict disclosure of data for immigration enforcement, and AAMVA has agreements with states that restrict disclosure of state data. With respect to this last category, AAMVA advised:

> All MPRs are created by states and provided to AAMVA specifically for the operation of CPLIS to facilitate individual queries. Many of AAMVA's agreements with states classify state-provided data as "Protected" or "Confidential" and prohibit disclosure of state data to any third parties except as authorized by the state. Specifically, our analysis has revealed express restrictions on AAMVA's disclosure of state data in agreements with [certain states]. Numerous states have objected to AAMVA's disclosure of the data on the basis of these contractual restrictions. States have also asserted that they, not AAMVA, are owners of the data and therefore responsible for determining whether and when to disclose the data in response to requests by any third party. Both sets of restrictions can be resolved by states authorizing the release of the data to FMCSA.

*Id.* at 16 (letter dated August 7, 2026).

By the same letter dated August 7, 2026, AAMVA advised the Federal Defendants that it provided notice of their Data Demand to the "[51 impacted jurisdictions] that own the data" and that "AAMVA's response to this [Data] demand is complicated by the fact that, on the one hand, DOT asserts that MPRs are subject to unrestricted federal access, while, conversely, many of the AAMVA's member jurisdictions assert strict disclosure constraints on the data." *Id.* at 13 ("In fact,

---

[2] In the same letter, AAMVA requested that DOT "confirm in writing that AAMVA's production of the pointer records will be an act carried out on behalf of, and at the specific direction of, DOT under AAMVA's agreements with DOT, and thereby subject to liability protection under the government contractor defense or related doctrines of derivative sovereign immunity." [Doc. No. 1-2] at 11.

in response to our notice, more than twenty jurisdictions have formally objected to AAMVA's proposed production of this state data."). Pointing out that "AAMVA is a private non-profit corporation subject to compliance with state laws as a custodian of state data," AAMVA

> concluded that production of the MPRs would create significant questions as to AAMVA's compliance with its obligations under many user agreements between AAMVA and states that participate in the [CDLIS], state civil laws prohibiting disclosure of information contained in MPRs, and even certain state criminal laws prohibiting disclosure of information contained in MPRs.

*Id.* Given these considerations, AAMVA advised that "one of the options AAMVA will consider with respect to the data demand will be facilitating an opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data." *Id.* at 14.

In response, by letter dated August 11, 2026, to AAMVA, Defendants DOT and FMCSA, acting through their General Counsel, stated that AAMVA's "opt-in or opt-out choice by the states" is "unacceptable" and that "[g]iven your shift in position, DOT has no choice but to take immediate action to secure the production of the requested pointer records," referencing, as implementation of that decision, that "[t]oday, the Department of Homeland Security will reissue the administrative subpoena it previously withdrew[]" and that "[u]nless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena, and considering terminating its contract with AAMVA." *Id.* at 21.

Unlike in *Jake's Fireworks*, in which a Notice of Noncompliance functioned "more like a tentative recommendation than a final and binding determination" because the Compliance Office staff indicated only that they "*may request*" the Consumer Product Safety Commission to approve the issuance of an administrative complaint, 105 F.4th at 632, nothing in the August 11 letter with respect to the Federal Defendants' Data Demand and their decision to enforce it is "tentative or

interlocutory in nature . . . ." *Id.* at 631. Rather, the August 11 letter reaffirmed without qualification the Federal Defendants' Data Demand and likewise stated in unqualified terms that noncompliance with DOT's Data Demand would give DOT "no choice" but "to take immediate action to secure the production of the requested pointer records." [Doc. No. 1-2] at 21. Given these aspects of the DOT's Data Demand, *Jake's Fireworks* is clearly distinguishable and does not counsel finding that the Court has no jurisdiction.

The Court likewise finds unpersuasive the Federal Defendants' criticism of the Court's reliance on the D.C. Circuit's decision in *Weaver v. FMCSA*, 744 F.3d 143 (D.C. Cir. 2014), which they contend was an "outlier decision" that was "incorrectly decided," [Doc. 101] at 9, or its reliance on readily distinguishable Ninth Circuit cases, such as *U.S. West Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1054 (9th Cir. 2000), which held that "agency *orders* are 'final orders' for the purposes of the Hobbs Act." (emphasis added).

**II. Plaintiffs have made a clear showing that they are likely to succeed on the merits of their claims.**

A. Plaintiffs' Claims under the Administrative Procedure Act

For the reasons stated in the TRO and below, the Plaintiffs are likely to prevail on their claims that the Federal Defendants' actions are contrary to law or arbitrary and capricious in violation of the APA.

***First***, the Federal Defendants issued the Data Demand without consulting with the States in likely violation of their duty to consult under 49 U.S.C. § 31309(a). As explained in the Court's TRO, the CMVSA, which the Federal Defendants invoke as a basis for the Data Demand, reflects the protected status of the information transferred from the states to the CDLIS and requires that the Secretary of Transportation "consult with the States in carrying out this section." 49 U.S.C. § 31309(a). The Federal Defendants do not dispute that they failed to consult the States before

issuing the Data Demand that seeks the transfer to them of 17 million records. Nevertheless, they contend that no consultation was required because their demands and threatened sanctions are not sufficiently related to carrying out that section to trigger the consultation requirement. But the Federal Defendants' actions contravene the very premise of the CMVSA and its implementing regulations, which make clear that the States will provide highly sensitive information under certain protections, including the retention of ownership, and that they play a central role in CDLIS's design and operation, including the exclusive power to add, delete, or alter the records they have contributed. [Doc. No. 3] at 7 (citing administrative and legislative materials). The FMCSA has never before requested any information on the scale reflected in the Data Demand or threatened sanctions for non-compliance, all of which clearly reflect a change in policy and practice with respect to carrying out the CMVSA that requires consultation with the states; and given the Federal Defendants' lack of control or ownership over the requested data, the Federal Defendants cannot, in effect, unilaterally replace the AAMVA with the FMCSA as the depository for CDLIS.

***Second***, compliance with the Federal Defendants' demand that the AAMVA transfer the MPRs would likely violate the DPPA, which prohibits "any person" from knowingly "obtain[ing] or disclos[ing] any personal information[] from a motor vehicle record" unless one of fourteen enumerated exceptions applies. 18 U.S.C. § 2722(a); *see id.* §§ 2721(a)(1), (c). In that regard, the sole exception under the DPPA which FMCSA identified as a basis for disclosure, the government use exception, *id.* § 2721(b)(1), is likely not applicable here because the Federal Defendants have not made any credible showing that FMCSA will actually use all of the records it demands or that there is a particular statutory function for which FMCSA intends to use the bulk data, while making clear that they are not seeking the data solely for FMCSA's own use in discharge of its own

statutory mandates, but so that the FMCSA can share the information with DHS for use in connection with immigration enforcement.

***Third***, the transfer of the MPRs as demanded in the Data Demand would likely violate the Privacy Act because the Federal Defendants (a) have not complied with the Act's notice requirements that FMCSA must satisfy before including new data into a new or newly modified "system of records"; (b) have failed to articulate a specific purpose "required to be accomplished" by FMCSA that would justify the possession and maintenance of these records, *see* 5 U.S.C. § 552a(e)(1); and (c) intend to transfer the Data to third parties, including other federal agencies, such as DHS, in likely violation of prohibitions against disclosing personal information. The Federal Defendants also likely failed to comply with their own longstanding policy, developed pursuant to federal statute, that prescribes how other federal agencies can obtain access to information in CDLIS. *See* 49 U.S.C. § 31106(e) ("The Secretary shall develop a policy on making information available from [CDLIS]," which "shall be consistent with existing Federal information laws, including regulations, and shall provide for review and correction of such information in a timely manner."); *id.* § 31309(c) ("Information in the information system shall be made available and subject to review and correction in accordance with the policy developed under section 31106(e)."); FMCSA Policy on Availability of Information From CDLIS, 70 Fed. Reg. 2455 (Jan. 13, 2005) (outlining FMCSA's policy that other federal agencies can "request access" to CDLIS information by submitting a written request to FMCSA's Chief Safety Officer and executing a "Memorandum of Understanding" with "[DOT] and/or FMCSA"). In sum, nothing in the Federal Defendants' policies allows federal agencies to obtain CDLIS records in bulk, only at most *access*, as AAMVA provides, and as the states provide on a more substantive level.

With respect to their challenge to the Court's conclusion that the Plaintiffs fall within the

"zone of interests," the Federal Defendants contend that Plaintiff States are in reality asserting *parens patriae* standing. [Doc. No. 101] at 12. But as the Court found, Plaintiffs' own interests relating to the information conveyed to the AAMVA fell within "the zone of interests" protected by the Privacy Act and the DPPA, as reflected, *inter alia*, in DOT's own policy statement that the MPRs, which contain personal identity information on already-registered individuals and those seeking registrations in the States, are documents "owned by each State." *See, e.g.*, Fees for Commercial Driver's License Information System, 91 Fed. Reg. 28514, 28517 (proposed May 18, 2026). Federal Defendants contend that this "property interest" is not protected or does not give standing under the Privacy Act or the DPPA, but that "property interest" simply underscores and reflects the protectible privacy interests the States themselves have in preserving from improper disclosure the confidential information they required their residents to turn over to them, including maintaining the public trust, ensuring that residents continue to apply for driver's licenses, and protecting their sovereign interest in enforcing their state laws and obligations that protect the privacy of CDLIS records.

In sum, Plaintiff States seek to protect their own interest in maintaining public trust and ensuring that residents continue to apply for driver's licenses and to protect their sovereign interests in enforcing their state laws and obligations that protect the privacy of CDLIS records. These interests clearly fall within the zone of interests to be protected by the DPPA and the Privacy Act.

***Fourth***, to the extent that the Federal Defendants have offered any rationale for their decision to issue the Data Demand, it is likely to be found insufficient to meet the requirements for reasoned agency decisionmaking under the APA. For example, the Federal Defendants have failed to (a) consider important aspects of the problem, including the available alternatives, costs,

and potential harms of taking possession and sharing the sensitive personal information of 17 million individuals as well as the consequences that would ensue if FMCSA carried out its threat to shut down CDLIS; (b) acknowledge or explain the dramatic change in policy that the Data Demand embodies; (c) consider the reliance interests in having this data kept private; and (d) follow their own policy, developed pursuant to federal statute, by which other federal agencies can obtain access to information in CDLIS when lawful to do so.

With respect to the Federal Defendants' professed "urgent need" for the Data, they again rely on the *ipse dixit* that the data transfer is needed to perform their statutory mandates, but even if this most recent *post hoc* explanation, far beyond anything presented in the August 11 letter, is to be considered, the most recent declaration filed in support of that position, [Doc. No. 101-1] (second Liberatore declaration), does little more than underscore the Federal Defendants' inability to give any understandable substantive explanation for how the limited but highly sensitive information contained in the MPRs would contribute in any meaningful way to any of its stated, mostly hypothetical uses. Nor does it explain why their recognized access to the CDLIS or their existing access to state records (where the information that would appear useful to them resides) is not sufficient, as it apparently has been for decades, during which the Federal Defendants have conducted annual audits of the States' driver records. Moreover, as mentioned above, there is nothing in any of the Federal Defendants' relied upon statements of need that reflects in any way the required administrative decisionmaking that has considered alternatives to the requested information, which appear in this case to be substantial and fulsome, or the costs imposed on the Plaintiffs and their residents, which are substantial and irreparable.

Given the absence of any credible substantive explanation for how the requested data transfer is needed for FMCSA to perform its statutory purpose, and given that FMCSA can already

access CDLIS records by making individual queries and continue to access the driver records themselves held by the States, the compelling inference is that the Federal Defendants seek these 17 million files in large part, if not primarily, for immigration enforcement, which is not part of FMCSA's statutory mandate, particularly given that, as they concede, they are acting in coordination with and in concert with the DHS, as evidenced by, *inter alia*, DOT's own statement in their August 11 letter that should AAMVA not comply with the Data Demand, DOT would "fil[e] an enforcement action to enforce the [DHS Administrative] subpoena." [Doc. No. 1-2] at 21.

B. The Spending Clause

Plaintiff States are likely to prevail on their claim that the Data Demand, with its threatened sanctions, violates the Spending Clause because the CDLIS statute does not provide or identify any clear notice to the states that as a condition of receiving a portion of their federal highway funds they have agreed to surrender or transfer in bulk their sensitive personal identifying information on their residents to FMCSA, or any other agency of the federal government. *See* 49 U.S.C. § 31311 (providing a detailed list of requirements for state participation in CDLIS). Moreover, the CDLIS's existence to serve as a clearinghouse, so as to allow States to exchange with one another information owned by the States themselves, reinforces the conclusion that the States did not knowingly or voluntarily agree to turn over their records wholesale to FMCSA by accepting federal highway funds. The Federal Defendants see no difference between a condition that requires access to information in the CDLIS and the transfer of the entire CDLIS into a substitute depository system not qualified to hold it; and in support of that position, the Federal Defendants contend that "[a] necessary corollary of 'access' is the ability to obtain the CDLIS information and take custody of it." [Doc. No. 101] at 13. But given the nature of the information

involved, the source of that information, who owns that information, the purpose for which the AAMVA was created in the first place, and the assurances and protections put in place with respect to its creation and operation, the relied upon "corollary" is hardly a "necessary" one or even one reasonably inferred, and in any event, it is hardly a "clear condition" of federal funding, as required.

C. State Contracts

The Plaintiff States of Illinois, California, Maine, and the District of Columbia (the "Contract Plaintiffs") are likely to succeed on their claims that AAMVA cannot lawfully disclose their records under its contracts with those States. Each of these States have entered into contracts with AAMVA to restrict what AAMVA may do with the State's proprietary and confidential driver information, and each imposes strict limitations on the disclosure of such information. The Data Demand does not fall within these strict limitations and none of the Contract Plaintiffs have given AAMVA permission to disclose state data to FMCSA or DHS in response to the Data Demand. Rather, the Contract Plaintiffs have unambiguously communicated that AAMVA does not have permission to carry out a bulk transmission of their respective data. AAMVA's transfer of Plaintiffs' contract protected data to FMCSA or DHS would likely violate the respective contracts. *See* [Doc. No. 46] at 11.

**III. The Plaintiffs have made a clear showing of irreparable harm in the absence of injunctive relief.**

The shutdown of CDLIS or the transfer of Plaintiff States' CDLIS data in response to Federal Defendants' Data Demand would irreparably harm Plaintiff States and the public. The unauthorized disclosure of the MPRs, which involves a large-scale disclosure of sensitive personal information, constitutes irreparable harm. Such a large-scale, unregulated, and irreversible distribution inevitably compromises and undermines the public's trust in the Plaintiff States'

promises to safeguard their residents' personal information, possibly resulting in fewer people seeking driver's licenses, a drop in fee revenue, and a potential increase in unauthorized driving and the attendant public safety risks. Additionally, if Federal Defendants follow through on the threat to effectively shut down CDLIS by terminating the federal funding that sustains it and the cooperative agreement that authorizes AAMVA to operate it, Plaintiff States could lose the ability to issue CDLs—and possibly *all* driver's licenses—and their ability to monitor and ensure the safe operation of commercial motor vehicles within their respective borders would be impaired. Disclosure of the States' data would also impose significant compliance burdens on Plaintiff States, requiring some States to give notice to residents and necessitating revisions to official forms and communications. If the Federal Defendants succeed in taking custody of Plaintiff States' CDLIS data, thereby creating a new database of State-owned information that the States can no longer control, update, or correct, the Plaintiff States and their residents face the risk that the Federal Defendants, or other federal agencies with whom they share the data, will take adverse actions against them based on out-of-date, incomplete, or erroneous information.

**IV. The balance of equities is in Plaintiffs' favor.**

Maintaining the status quo by preliminarily enjoining Federal Defendants from carrying out their threats would not harm Federal Defendants because they retain their demonstrated abilities to perform their statutory functions, as they have done for decades, without the demanded data and do not have a satisfactory explanation as to how obtaining this wholesale transfer of data would materially assist them. Preliminary relief also would not harm AAMVA, which has not endorsed this transfer and joins in the request for injunctive relief.

**V. Preliminary injunctive relief is also in the public interest.**

Injunctive relief would preserve the system that has been in place for decades that facilitates

the issuance of commercial driver licenses to qualified individuals and, as a result, public safety. Were federal funding to AAMVA terminated, the CDLIS would effectively cease its operations, impairing Plaintiff States' ability to issue and renew CDLs to qualified individuals and compromising the safe operation of commercial motor vehicles. Any shutdown of CDLIS, which is interconnected with all forms of driver licensing, could disrupt or even stop the issuance and renewal of any driver's licenses in the United States. *See* [Doc. No. 46] at 13.

**VI. The entered injunction is the appropriate remedy.**

The Federal defendants contend that "[t]he APA only authorizes courts to 'set aside' and 'postpone' agency actions—a far narrower authority than the court's equitable powers of issue plumbing or injunctive relief." [Doc. No. 101] at 20 (internal quotations omitted) (quoting *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 623 n. 14 (D. Md. 2025)). The Federal Defendants also contend that "any relief should not prohibit DOT's Office of Inspector General (DOT-OIG) from exercising its independent authorities, should it determine the need for the CDLIS data." *Id.*

The appropriate scope of preliminary injunctive relief is that which is necessary to afford a plaintiff complete relief from the threatened harm. *Dmarcian, Inc. V. DMARC Advisor BV*, 182 F.4th 289, 305 (4th Cir. 2026). Nor does the APA restrict the entry of injunctive relief, as the Federal Defendants contend. *See Roe v. Dep't of Def.*, 947 F.3d 207, 219, 234 (4th Cir. 2020) (affirming the grant of a preliminary injunction resting on an APA claim). The Court has considered the appropriate scope of injunctive relief and concludes that the preliminary injunction it intends to enter is of necessary scope, and to the extent the Federal Defendants conclude that it improperly restricts them from engaging in other lawful agency action, it may present that issue to the Court for consideration, with a request that the injunction be amended.

## VII. CONCLUSION

For all of the above reasons, Plaintiffs have made a clear showing that (1) they are likely to succeed on the merits of their claims, (2) they would experience irreparable harm in the absence of injunctive relief, (3) the balance of equities is in their favor, and (4) granting injunctive relief is in the public interest. Accordingly, it is hereby

**ORDERED** that pending further order of the Court the Defendant AAMVA, its officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them, be, and the same hereby are, **ENJOINED** from transferring to the Federal Defendants or any other agency the Plaintiff States' CDLIS Master Pointer Records, as requested in the Data Demand; and it is further

**ORDERED** that pending further order of the Court the Defendants DOT, FMCSA, Secretary of Transportation, and the Administrator of FMCSA, their officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them, be, and the same hereby are, **ENJOINED** from taking any adverse actions against the Plaintiff States or the AAMVA based on the failure to transfer to them the information requested in the Data Demand, including, without limitation, terminating or threatening to terminate AAMVA's federal contracts or funding, terminating or threatening to terminate Plaintiff States' federal contracts or funding, or taking any other action that could impair the operation of CDLIS or Plaintiff States' ability to issue commercial driver's licenses; and it is further

**ORDERED** that no security is required to be posted by the Plaintiff States pursuant to Federal Rule of Civil Procedure 65, the Court finding that no such security is necessary.

The Clerk is directed to forward a copy of this Order to all counsel of the record.

/s/
Anthony J. Trenga
Senior United States District Judge

September 17, 2026
Alexandria, Virginia

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>Defendants. | ) | 1:26-cv-2547 (AJT-IDD) |

**ORDER**

Upon consideration of the Federal Defendant's Expedited Motion for Clarification of the Court's preliminary injunction, [Doc. No. 117], the Motion is **DENIED**. The scope of the preliminary injunction, [Doc. No. 113], is clear on its face with respect to the transfer of the files constituting the Data Demand and to the extent any federal officer or agency is unclear whether an actually contemplated action, decision or course of conduct would be in violation of the Court's Order, those concerns can be brought to the Court for a ruling.

The Clerk is directed to forward a copy of this Order to all counsel of the record.

October 2, 2026
Alexandria, Virginia

/s/
Anthony J. Trenga
Senior United States District Judge

**IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-2547 |

**THIRD DECLARATION OF THOMAS J. LIBERATORE**

Pursuant to 28 U.S.C. § 1746, I, Thomas J. Liberatore, declare and state as follows:

1. I am the Acting Associate Administrator in the Office of Safety at the Federal Motor Carrier Safety Administration ("FMCSA" or "Agency"), an operating administration of the U.S. Department of Transportation ("DOT"). I previously signed and submitted two Declarations in this case, *see* ECF Nos. 45-2; 101-1, and I incorporate by reference the information discussed therein.

2. As Acting Associate Administrator for Safety, I support FMCSA's mission of reducing crashes, fatalities, and injuries involving large trucks and buses. I oversee FMCSA's safety operations, including all Division Offices, Service Centers, and Headquarters safety and enforcement operations. FMCSA's Headquarters safety and enforcement operations is comprised of the Office of Enforcement and Compliance and Office of Safety Programs, which includes the Commercial Driver's License ("CDL") Division. The CDL Division works to develop, maintain, and enforce standards for testing and ensuring the fitness of commercial motor vehicle drivers and, in coordination with the American Association of Motor Vehicle Administrators

("AAMVA") and the States, works to ensure the Commercial Driver's License Information System ("CDLIS") is operated in accordance with applicable Federal laws and regulations.

3. In my official capacity, I have access to FMCSA records reflecting its oversight of CDLIS, as well as the development, maintenance, and enforcement of CDL standards. I have access to the information referenced herein. As such, I am fully familiar with the facts set forth in this Declaration, which were considered by the agency when it issued the August 11 Letter to AAMVA.

**Urgent Need for the Requested CDLIS Data**

4. As explained in my Second Declaration, the requested CDLIS pointer data will serve many of FMCSA's purposes, including investigation and enforcement activities, collection of civil penalties, State performance monitoring (particularly as it relates to the issuance of non-domiciled CDLs), and data analytics. *see* ECF No. 101-1 at 2.

5. Though some of the CDLIS data uses described in my Second Declaration would support the Agency's routine activities, such as collection of civil penalties, FMCSA has an ongoing urgent need for the data to support the Agency's safety critical functions.

6. My First and Second Declarations described the systemic, nationwide regulatory non-compliance by States in issuing non-domiciled commercial learner's permits (CLPs) and CDLs uncovered during the 2025 Annual Program Reviews. FMCSA has an urgent need for the CDLIS data to monitor State compliance with Federal regulations in issuing CLPs and CDLs. The data access is imperative given the Agency's urgent need to monitor the licensing practices of States that have not downgraded unlawfully issued CLPs and CDLs.

7. The requested CDLIS data will enable FMCSA to conduct batch queries to obtain CLP and CDL issuance and expiration dates and other information about the driver and the

licensing process. FMCSA urgently needs this information to cross reference licensing information against other government information systems to ensure States are issuing CDLs to drivers who are qualified, properly trained, and do not pose significant safety risk. FMCSA's immediate access to the CDLIS data is critical to the Agency's ability to be proactive in identifying unqualified CLP and CDL holders and taking them off the road before crashes occur that could result in injuries and fatalities.

8. Further, FMCSA urgently needs the CDLIS data to assess whether significant safety incidents were caused by drivers who were improperly issued a CLP or CDL. Without the requested CDLIS data, FMCSA will be significantly hindered in its ability to act quickly to ensure unsafe and unqualified drivers are taken off the Nation's highways and to ensure that State programmatic failures that resulted in the CDL being issued to an unqualified driver in the first instance are corrected immediately.

9. As explained in my Second Declaration, FMCSA cannot perform a bulk query that would capture all relevant records because the Agency does not have a list of CLP and CDL numbers and cannot obtain that information from other means. This limits significantly FMCSA's ability to perform its statutory obligation to oversee State CDL issuance and ensure national compliance and uniformity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 7, 2026, at Washington, D.C.

THOMAS JOSEPH LIBERATORE

Digitally signed by THOMAS JOSEPH LIBERATORE
Date: 2026.10.07 13:48:25 -04'00'

By: ______________________________

Thomas J. Liberatore
Acting Associate Administrator for Safety
Federal Motor Carrier Safety Administration
U.S. Department of Transportation

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>Defendants. | ) | 1:26-cv-2547 (AJT-IDD) |

**<u>ORDER</u>**

On October 8, 2026, Defendants the Federal Motor Carrier Safety Administration (FMCSA) and the Department of Transportation (DOT) (the "Federal Defendants") filed a Notice of Appeal, [Doc. No. 134], with respect to the Court's Preliminary Injunction Order issued on September 17, 2026, [Doc. No. 113], together with their pending Motion to Stay the Court's Preliminary Injunction Pending Appeal (the "Motion to Stay"). [Doc. Nos. 135].

In substance, the Preliminary Injunction Order preserves the status quo that has been in effect for nearly forty years pending a final resolution concerning the Federal Defendants' demand that the American Association of Motor Vehicle Administrators (the "AAMVA") turn over to them 17 million files containing highly sensitive personal identifying information, including social security numbers, collected by and provided to it by the states for the purpose of sharing among themselves information to be used in connection with their issuance of commercial driver's licenses ("CDL"), referred to as the "Data Demand." By seeking a stay of the Court's Preliminary Injunction Order, which enjoins AAMVA from complying with the Federal Defendants' Data Demand and the Federal Defendants and other federal agencies from imposing threatened sanctions for AAMVA's non-compliance with the Data Demand, the Federal Defendants seek, in

effect, the ability during its appeal to continue pressing its Data Demand and to impose for AAMVA's non-compliance the threatened sanctions and adverse consequences that would undermine, if not cripple, AAMVA's ability to function and discharge the public safety purposes for which it was created.[1]

Based on the current record, the Court has considered the factors that a movant must satisfy to obtain a stay pending appeal, and in particular a stay of a preliminary injunction order, as well as the parties' arguments in support thereof and in opposition thereto,[2] and conclude that none of the applicable factors weigh in their favor, and for those reasons, it is hereby

**ORDERED** that the Federal Defendants' Motion to Stay, [Doc. No. 136], be, and the same hereby is, **DENIED**; and it is further

---

[1] As the Court summarized in its temporary restraining order [Doc. No. 54] at 3–4:

> In 1986, Congress determined that the absence of an efficient means for States to share information about CDL holders had led to "the practice of multiple license use by commercial drivers," which allowed them to "spread their traffic violations over a number of licenses, and maintain a 'good driver' rating regardless of the number of violations." S. Rep. No. 99-570, at 3 (1986). To remedy this problem, Congress enacted the CMVSA, in which it directed the Secretary of Transportation to "maintain an information system," known as the Commercial Driver's License Information System ("CDLIS"), that serves "as a clearinghouse and depository of information pertaining to the licensing and identification of operators of commercial motor vehicles and the disqualification of such operators from operating commercial motor vehicles." 49 U.S.C. §§ 31309(a), (d) . . . .
>
> The Secretary is authorized to maintain this database either directly or through a third-party "authorized operator." *Id.* § 31309(d). Since 1988, the Secretary has designated AAMVA, a nonprofit member association composed of motor vehicle administrators in every State and territory, to serve as CDLIS's only authorized operator. *See* 76 Fed. Reg. 68328, 68329 (Nov. 4, 2011).

[2] The Court has considered the parties' positions, as set forth in the Motion to Stay, [Doc. Nos. 135, 136], the Plaintiff States' Opposition to Federal Defendant's Motion to Stay the Preliminary Injunction Pending Appeal, [Doc. No. 156], the Plaintiff-intervenor American Federation of Teachers' Memorandum of Law in Opposition to Motion to Stay Preliminary Injunction Pending Appeal, [Doc. No. 155], the Defendant AAMVA's Opposition to Federal Defendants' Motion to Stay Injunction Pending Appeal, [Doc. No. 152], and the Federal Defendants' Reply thereto. [Doc. No. 159]. In that regard, the Court has specifically considered "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merit; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Niken v. Holder,* 556 U.S. 418, 434 (2009). The Court has also considered the "admittedly difficult legal question" standard proposed by the Federal Defendants, *see* [Doc. No. 136] at 2; [Doc. No. 159] at 2-4, and concludes that a stay is also not warranted under that standard.

**ORDERED** that the hearing on the Motion to Stay currently scheduled for November 4, 2026, is **CANCELLED**.

The Clerk is directed to forward a copy of this Order to all counsel of the record.

/s/
Anthony J. Trenga
Senior United States District Judge

October 29, 2026
Alexandria, Virginia

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:26-cv-2547 (AJT-IDD) |
| U.S. DEPARTMENT OF TRANSPORTATION, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff-intervenor American Federation of Teachers ("AFT") has filed a Motion for a Stay under 5 U.S.C. § 705 (the "Motion to Stay"), [Doc. No. 131], in which it seeks an order that stays in its entirety the demand of the Agency Defendants[1] to the American Association of Motor Vehicles Administrators (the "AAMVA") that it turn over to them 17 million files containing personal identifying information on those who have received or applied for commercial driver's licenses (the "Data Demand").

As the Agency Defendants concede, Section 705 of the Administrative Procedure Act (the "APA") "authorizes district courts to postpone the effective date of agency actions to the extent necessary to preserve the status quo and prevent irreparable harm before a final decision can be reached," [Doc. No. 157] at 3, and "[a] party seeking a stay under [Section 705] is subject to the same legal standard governing a motion for a preliminary injunction." *Id.* at 4 (citing *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020)). On September 17, 2026, the Court entered a Preliminary Injunction Order enjoining AAMVA from "transferring to the Federal

[1] The same Defendants referred to in this Motion as the "Agency Defendants" are referred to as the "Federal Defendants" in the Preliminary Injunction Order. *See* [Doc. No. 113] at 1 (referring to Defendants the Federal Motor Carrier Safety Administration (FMCSA) and the Department of Transportation (DOT)).

Defendants or any agency the Plaintiff States' CDLIS Master Pointer Records, as requested in the Data Demand . . . ." [Doc. No. 113] at 16.[2]

Upon consideration of the Motion to Stay, the memorandum in support thereof, [Doc. No. 158], and AAMVA's response and the Federal Defendants' opposition thereto, [Doc. Nos. 154, 157], the Court finds and concludes that AFT has standing to seek the relief sought in the Motion To Stay, the Court has jurisdiction to grant the Motion to Stay, and for the reasons stated in its Preliminary Injunction Order, the factors governing the issuance of the requested stay weigh in AFT's favor and the issuance of the requested stay is proper under 5 U.SC § 705, and it is hereby

**ORDERED** that AFT's Motion to Stay, [Doc. No. 131], be, and the same hereby is, **GRANTED** and the Agency Defendants' Data Demand is **STAYED** pending further order of the Court; and it is further

**ORDERED** that the hearing on the Motion to Stay currently scheduled for November 4, 2026, is **CANCELLED**.

The Clerk is directed to forward a copy of this Order to all counsel of the record.

/s/
Anthony J. Trenga
Senior United States District Judge

October 29, 2026
Alexandria, Virginia

[2] The CDLIS Master Pointer Records contain the limited but highly sensitive personal identifying information, including social security numbers, demanded by the Agency Defendants through their Data Demand.