Nos. 26-2491 (L), 26-2595

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

STATE OF ILLINOIS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Virginia (No. 1:26-cv-2547)
The Honorable Anthony J. Trenga

# STATE APPELLEES' OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL


BRIAN L. SCHWALB
Attorney General
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General
ASHWIN P. PHATAK
Principal Deputy Solicitor General
MITCHELL P. REICH
Senior Counsel to the Attorney General
400 Sixth St. NW
Washington, DC 20001

*(additional counsel on signature page)*

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General
ALEX HEMMER
Deputy Solicitor General
KATHLEEN NACCARATO
Assistant Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. Legal Background .......... 3

B. The Data Demand .......... 5

C. Proceedings Below .......... 6

ARGUMENT .......... 8

I. Defendants Have Not Made A Strong Showing That They Will Succeed On The Merits. .......... 9

A. No threshold issue bars review. .......... 9

B. The district court correctly held that the Data Demand was likely unlawful. .......... 14

1. The demand was arbitrary and capricious. .......... 15

2. The demand was contrary to law. .......... 19

3. The demand violated the Spending Clause. .......... 23

II. The District Court Did Not Abuse Its Discretion Issuing Injunctive Relief. .......... 25

A. Defendants have not shown irreparable injury .......... 25

B. The balance of the equities tilts sharply against a stay. .......... 27

CONCLUSION .......... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**


*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986) .......... 10, 11

*City of Alexandria v. Helms*,
728 F.2d 643 (4th Cir. 1984) .......... 13, 14

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 15

*dmarcian, Inc. v. DMARC Advisor BV*,
182 F.4th 289 (4th Cir. 2026) .......... 2, 25

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 15

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024) .......... 11

*Hendrick v. Maryland*,
235 U.S. 610 (1915) .......... 3

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) .......... 19

*HMO La., Inc. v. HHS*,
179 F.4th 62 (D.C. Cir. 2026) .......... 16

*Jake's Fireworks Inc. v. CPSC*,
105 F.4th 627 (4th Cir. 2024) .......... 11, 12

*Landor v. La. Dep't of Corr.*,
609 U.S. 59 (2026) .......... 4, 23

*MacLean v. DHS*,
543 F.3d 1145 (9th Cir. 2008) .......... 13

*McMichael v. James Island Charter Sch.*,
840 F. App'x 723 (4th Cir. 2020) .................................................. 23

*Michigan v. EPA*,
576 U.S. 743 (2015) .......................................................................... 18

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................... 15, 16, 17

*Nken v. Holder*,
556 U.S. 418 (2009) ..................................................... 2, 8, 9, 26, 27

*Roe v. DOD*,
947 F.3d 207 (4th Cir. 2020) ........................................................ 18

*Russello v. United States*,
464 U.S. 16 (1983) .......................................................................... 13

*Senne v. Vill. of Palatine*,
695 F.3d 597 (7th Cir. 2012) (en banc) .......................................... 23

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ..................................................................... 9, 10

*Weaver v. FMCSA*,
744 F.3d 142 (D.C. Cir. 2014)............................................ 12, 13, 14

## STATUTES, REGULATIONS, AND RULES

5 U.S.C.
§ 551......................................................................................... 13
§ 552a....................................................................................... 21

18 U.S.C. § 2721 ................................................................................ 22

28 U.S.C. § 2342 ................................................................................ 12

49 U.S.C.
§ 31106...................................................................................... 24

§ 31309 .......... 3, 4, 7, 19, 20, 24
§ 31311 .......... 3, 4
§ 31314 .......... 4

49 C.F.R. § 384.225 .......... 4, 20, 24

70 Fed. Reg. 2454 (Jan. 13, 2005) .......... 16, 18, 24

71 Fed. Reg. 35727 (June 21, 2006) .......... 21, 22

89 Fed. Reg. 50235 (June 13, 2024) .......... 21

91 Fed. Reg. 28514 (May 18, 2026) .......... 16

Fed. R. Civ. P. 65 .......... 26

## OTHER AUTHORITIES

Off. of Mgmt. & Budget, Circular No. A-108 (2016), https://bit.ly/4ewW99X .......... 21

U.S. Dep't of Transp., *Privacy Impact Assessment for CDLIS* (Jan. 11, 2011), https://bit.ly/48DTK9S .......... 4, 21

## INTRODUCTION

For decades, States have entrusted the private information of millions of their residents—every person licensed to drive a commercial motor vehicle—to a database operated by the American Association of Motor Vehicle Administrators ("AAMVA"). Pursuant to federal and state law, States consult that database before issuing commercial driver's licenses ("CDLs") to ensure that applicants can safely drive on state streets. Although the federal government can access records held in the database, those records "belong to the States," Doc. 46 at 7, and until now the federal government has never sought to take custody of them.[1]

This summer, the U.S. Department of Transportation ("DOT") and its subagency the Federal Motor Carrier Safety Administration ("FMCSA"; together, "defendants") issued an unprecedented demand to AAMVA: turn over 17 million records in the database or lose all federal funding. When AAMVA failed to comply, the Department of Homeland Security ("DHS") issued a subpoena for the same records, asserting that

---

[1] The addendum is cited "A," the stay motion is cited "Mot.," and entries on the district court's docket are cited "Doc."

it needed them for immigration enforcement. Twenty-four States sued to enjoin enforcement of DOT's demand, and the district court issued a preliminary injunction, holding that the demand was arbitrary and capricious, contrary to federal law, and violated the Spending Clause. Defendants appealed and seek a stay pending appeal.

Defendants fall far short of demonstrating their entitlement to that "extraordinary remedy." *Nken v. Holder*, 556 U.S. 418, 428 (2009). The district court properly exercised jurisdiction and correctly held that the demand was likely unlawful in multiple respects. Defendants have never seriously attempted to explain the basis for their decision, after *decades*, to try to take possession of the States' records, making that decision arbitrary and capricious under the Administrative Procedure Act ("APA"), and the demand violates both defendants' authorizing statutes and federal privacy laws. Nor did the court err, much less clearly err, in finding that the demand would irreparably harm the States. In the end, the court did not abuse its discretion in entering preliminary relief that "preserve[s] the relative positions of the parties," *dmarcian, Inc. v. DMARC Advisor BV*, 182 F.4th 289, 305 (4th Cir. 2026), while this case is litigated. The stay motion should be denied.

## BACKGROUND

### A. Legal Background

The licensing of the Nation's drivers, including the drivers of commercial motor vehicles, is "uniformly recognized" as a traditional police power of the States. *Hendrick v. Maryland*, 235 U.S. 610, 622 (1915). This case concerns a clearinghouse created over three decades ago by the States and the federal government to prevent drivers from obtaining CDLs from multiple States and amassing—and concealing—safety infractions across those States. The States and the federal government thus agreed to create a nationwide database of state records "about the licensing, identification, and disqualification of operators of commercial motor vehicles," 49 U.S.C. § 31309(a)—the Commercial Driver's License Information System, or "CDLIS."

CDLIS operates in the following manner. Each participating State provides personally identifying information about state residents who are licensed to drive commercial vehicles, as well as any residents the State has disqualified from holding a CDL, or whose CDL has been canceled. *Id.* § 31311(a)(7)-(8). Those records—"master pointer records," or "pointers"—include each individual's name, date of birth,

and Social Security and driver's license numbers. *Id.* § 31309(b). States query the CDLIS database before issuing or renewing CDLs and, if the database indicates that another State maintains records about the applicant, requests full records from the State that holds them. *Id.* § 31311(a)(5)-(6), (c). If that request reveals records that disqualify an applicant, the State denies the license. *Id.* § 31311(a)(9)-(12).

States participate in CDLIS on a voluntary basis in exchange for federal highway funds. *See Landor v. La. Dep't of Corr.*, 609 U.S. 59, 67 (2026) (analogizing "spending legislation" to a "compact"); 49 U.S.C. §§ 31311, 31314(c). Although Congress permitted DOT to establish and maintain CDLIS itself, it also authorized DOT to delegate those tasks to a third party, 49 U.S.C. § 31309(d), and AAMVA, a nonprofit member association of state motor vehicle administrators, has operated the database since its inception.

The States and DOT enjoy equal access to the database, 49 C.F.R. § 384.225(e), and use it to ascertain whether individuals are eligible to operate commercial motor vehicles, 49 U.S.C. § 31309(a). But all have long agreed that the records in the database "belong to the States," Doc. 46 at 7 (AAMVA); DOT, *Privacy Impact Assessment for CDLIS* (Jan. 11,

2011) (CDLIS is "maintained and operated by the States"),[2] and DOT has never asserted an entitlement to take custody of the database or the records within.

### B. The Data Demand

This summer, the federal government abruptly adopted a different position regarding its entitlement to the CDLIS database. On June 25, defendants sent a letter to AAMVA demanding that it turn over records corresponding to "all individual pointers within CDLIS for the last five years"—approximately 17 million records. A7-8. Defendants did not explain why they sought the records, nor cite authority for the demand.

Because it had never "received such a request," AAMVA sought clarification about the request's purpose and legal basis. A8-9. Defendants stated only that they would use the records "as part of [their] statutory and regulatory oversight in ongoing efforts to ensure the integrity and issuance of [CDLs]" and commercial motor vehicles. A10.

On or around July 24, defendants explained that, if AAMVA refused to comply, it would "terminat[e]" "all of AAMVA's federal grants

---

[2] https://bit.ly/48DTK9S.

and contracts." A16. AAMVA said it would accede to defendants' demand, but not before it provided "notice" to the States, "as they are the owners of the data." *Id.* Four days later, AAMVA received a subpoena from DHS seeking "production of exactly the same information" for the purpose of enforcing federal immigration law. A18-19. Upon being informed of the Data Demand, over 20 States "formally objected" to the disclosure, and AAMVA informed defendants that it needed to deliberate before producing the records. A18.

Defendants sent a final letter on August 11, 2026, asserting that the records in CDLIS are "DOT's own records" and that AAMVA was "obligat[ed] to produce" them. A26. Defendants stated that, if AAMVA did not promptly comply with its demand, DOT would have "no choice but to take immediate action" and that "DOT will pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the [DHS] subpoena, and," if necessary, "terminating its contract with AAMVA." *Id.*

### C. Proceedings Below

Two days later, plaintiffs filed suit against defendants and AAMVA, seeking a temporary restraining order ("TRO") preventing

defendants from carrying out the Data Demand. Docs. 1, 2. Defendants opposed the TRO, again asserting a need for the data to fulfill general "statutory and regulatory mandates." A51. AAMVA took no position on the merits, but agreed that the data "belong[ed] to the States," defended CDLIS's "value to highway safety," and asked the district court to "protect AAMVA's operation of CDLIS while the legal issues in this case are resolved." Doc. 46 at 6, 11.

The court issued a TRO, A54, and, ultimately, a preliminary injunction, A83. The court held that it had jurisdiction, A85-89, and that the demand was likely unlawful in multiple respects. Defendants had offered no "credible substantive explanation for how the requested data transfer is needed for FMCSA to perform its statutory purpose," and the record gave rise to a "compelling inference" that defendants' stated rationale was pretextual, with the records actually sought for immigration enforcement. A93-94. The demand was thus likely arbitrary and capricious.

The demand also was likely contrary to law: Although CDLIS's authorizing statute required defendants to "consult with the States" in creating and maintaining CDLIS, 49 U.S.C. § 31309(a), defendants had

not done so prior to issuing the demand, A89-90. The demand also likely violated the federal Privacy Act and Driver's Privacy Protection Act ("DPPA"), which each limit disclosure of personal data. A90-91. And it likely violated the Spending Clause because Congress had not provided "clear notice" to States that they could obtain federal funds only by "surrender[ing]" records to the federal government. A94-95.

The court finally held that the demand would irreparably harm the States, and the equities favored an injunction. A95-97. The court found that the "large-scale disclosure of sensitive personal information" would "compromise[] and undermine[]" trust in state licensing agencies. A95-96. An injunction, by contrast, would merely "preserve the system that has been in place for decades." A96.

The district court denied defendants' motion for clarification of the injunction, A100, and motion for a stay pending appeal, A105.

## ARGUMENT

A stay is "an intrusion into the ordinary processes of administration and judicial review," and "is not a matter of right." *Nken*, 556 U.S. at 427. In evaluating a stay request, a court must consider (1) whether the applicant has made a "strong showing that [it]

is likely to succeed on the merits," (2) whether the applicant "will be irreparably injured absent a stay," (3) whether "issuance of the stay will substantially injure" others, and (4) where the public interest lies. *Id.* at 434. These factors overwhelmingly disfavor a stay.

## I. Defendants Have Not Made A Strong Showing That They Will Succeed On The Merits.

Defendants have not shown it is "likely," *id.*, they will succeed on the merits. The district court correctly held that it had jurisdiction and that the Data Demand was unlawful for multiple reasons.

### A. No threshold issue bars review.

To begin, the district court correctly held that the Data Demand constitutes final agency action and that the Hobbs Act is not a bar to review.

1. Agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597, 599 (2016). Action need not take any particular form to be final. *Id.* at 599 (describing this "pragmatic" approach). A letter, for instance, is final if it "unequivocally state[s] [the agency's] position" and "require[s]

[an entity's] immediate compliance." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436-37 (D.C. Cir. 1986) (quotation marks omitted).

That is precisely what the demand does. It unequivocally states DOT's position that records in CDLIS constitute "DOT's own records," and AAMVA is "obligat[ed] to produce [them] to DOT." A26. And it demands immediate compliance, vowing that "[u]nless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including canceling AAMVA's grants." *Id.* This demand is not "tentative or interlocutory"; it definitively states the agency's position and describes the "legal consequences"—termination of AAMVA's grants—that would flow from noncompliance. *Hawkes*, 578 U.S. at 597.

Defendants' contrary arguments fail. The Data Demand is not a mere "request" for information. Mot. 12. Earlier letters from DOT were indeed framed as "requests" or "encourage[ments]." A7, A11. But the final letter sent on August 11 is different: It sets forth AAMVA's legal "obligation[s]" and commits to take "immediate action" if AAMVA does not swiftly produce the demanded information. A26. Unlike an investigative step "far upstream" of potential "enforcement actions,"

*Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024), the Data Demand contains an ultimatum that AAMVA could not refuse without suffering serious legal consequences.

Nor is the demand nonfinal because it is signed by the agency's "chief counsel." Mot. 12. The August 11 letter explicitly speaks on behalf of "DOT" and commits that "DOT" will take immediate action. A26-27. There is "no reason to believe that the [chief counsel] lacks authority to speak for [DOT] on this issue or that [her] statement of the agency's position was 'only the ruling of a subordinate official' that could be appealed to a higher level of [DOT's] hierarchy." *Ciba-Geigy*, 801 F.2d at 437. On the contrary, the preceding correspondence shows the chief counsel repeatedly speaking on defendants' behalf. *E.g.*, A14-15 (setting forth "FMCSA's position" and how "FMCSA intends to use this data").

Finally, this case is unlike *Jake's Fireworks Inc. v. CPSC*, 105 F.4th 627 (4th Cir. 2024). There, this Court held that the Consumer Product Safety Commission did not take final agency action when its "Office of Compliance"—a "subordinate, investigatory, and advisory" body—issued "Notices of Noncompliance" containing "preliminary

findings and advice from agency staff." *Id.* at 632-33. The notices were nonfinal because they "represent[ed] the conclusions and advice of agency staff, not of the Commission itself," they did not convey the Commission's "final determination" as to "whether a violation has occurred," and the Commission was not required to "follow the recommendation of its Compliance Office." *Id.* at 632. The demand, by contrast, sets forth the position of "DOT," conveys a final determination regarding AAMVA's "obligation[s]," and unequivocally announces the "immediate action" that DOT will take if AAMVA does not comply. A26.

2. The district court was also correct that the Hobbs Act does not divest it of jurisdiction. That statute vests the appellate courts with exclusive jurisdiction to review certain "rules, regulations, or final orders of . . . the Secretary of Transportation." 28 U.S.C. § 2342(3)(A). But as the D.C. Circuit has explained, this list does not encompass all "final agency actions." *Weaver v. FMCSA*, 744 F.3d 142, 146 (D.C. Cir. 2014). A separate provision explicitly vests jurisdiction over "all final agency actions," 28 U.S.C. § 2342(7), so Congress's choice of a narrower

phrase in section 2342(3) must be presumed intentional. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

The demand is not a "rule, regulation, or final order[]" under section 2342(3). A60. It is not a "rule" or "regulation," as it is not "a statement of 'general or particular applicability and future effect.'" *Weaver*, 744 F.3d at 147 (quoting 5 U.S.C. § 551(4)). And courts have long construed the term "orders" in statutes channeling jurisdiction to the appellate courts to refer to those decisions that can sensibly be reviewed by an appellate court in the first instance—*i.e.*, decisions made through an "adjudication," pursuant to an administrative record compiled "with an eye toward judicial review." *Id.* at 147-48; *see, e.g.*, *City of Alexandria v. Helms*, 728 F.2d 643, 646 (4th Cir. 1984) ("the existence of a reviewable administrative record is a determinative factor" on this question); *MacLean v. DHS*, 543 F.3d 1145, 1149 (9th Cir. 2008) (same). The demand, which was neither the result of an adjudication nor based on a reviewable administrative record, lacks the defining characteristics of an "order" under this caselaw.

Defendants' responses lack merit. Defendants suggest that the demand must be an "order" for purposes of the Hobbs Act because (they

say) it qualifies as an "order" under the APA. Mot. 13. But courts have long read "order" more narrowly for purposes of jurisdiction-channeling provisions than for the APA. *See, e.g.*, *Weaver*, 744 F.3d at 146; *City of Alexandria*, 728 F.2d at 646. Nor is this case factually distinguishable from *Weaver*. The D.C. Circuit did not hold that the action there fell outside the Hobbs Act because it was "inchoate" or involved a "failure" to act. Mot. 14. Rather, it explained that district-court jurisdiction was proper because FMCSA's decision was not "comfortably described as an 'adjudication'" and "FMCSA ha[d] not compiled a record with an eye toward judicial review." *Weaver*, 744 F.3d at 146-47. The same is true here.[3]

### B. The district court correctly held that the Data Demand was likely unlawful.

The district court correctly concluded that the demand was likely unlawful on five separate grounds. A89-95. To obtain a stay,

[3] Plaintiffs have filed a protective petition for review in this Court. *See Illinois v. DOT*, No. 26-2407. Should this Court conclude that the Hobbs Act applies, plaintiffs will expeditiously seek preliminary relief and ask the Court to administratively stay the Data Demand while it adjudicates that motion.

defendants need to run the table, showing that the court erred in reaching *all* those conclusions. They cannot do so.

### 1. The demand was arbitrary and capricious.

The district court correctly held that the demand was likely arbitrary and capricious in violation of the APA.

The APA requires an agency to provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). An action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem." *Id.* at 43. An agency may not provide a "pretextual" explanation for its action. *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019). And when an agency changes a longstanding policy, it must "display awareness that it is changing position" and "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).

The district court correctly held that the demand likely failed these standards. A92-94. As the court explained, defendants did not offer *any* "credible substantive explanation" for their decision, after

decades, to upend the existing regulatory scheme. A93. In letter after letter, defendants offered only "*ipse dixit* that the data transfer [was] needed to perform their statutory mandates." *Id.* That bare-bones explanation falls far short of showing a "rational connection between the facts found and the choices made," *State Farm*, 463 U.S. at 43, given that defendants had fulfilled their statutory duties for decades under the existing regulatory regime, *i.e.*, querying the States' records through CDLIS. Nor did defendants explain why terminating AAMVA's funds—thus disabling CDLIS—was a rational response to AAMVA's refusal to comply.

Defendants' decision was arbitrary for other reasons, too. Defendants "abandoned a decades-old practice," *HMO La., Inc. v. HHS*, 179 F.4th 62, 71 (D.C. Cir. 2026) (cleaned up), and contradicted their own prior statements that CDLIS records "are not controlled by FMCSA," 70 Fed. Reg. 2454, 2455 (Jan. 13, 2005), but are instead "owned by each state," 91 Fed. Reg. 28514, 28517 (May 18, 2026)—but they failed to "acknowledge or explain th[is] dramatic change in policy," A93. Defendants' justifications were also likely pretextual: Although defendants told AAMVA they needed the records to conduct "statutory

and regulatory oversight," A10, the record reflects that defendants were coordinating their requests with DHS, which issued a subpoena for the same records for immigration-enforcement purposes—a subpoena *defendants* later threatened to enforce, A26.

Defendants offer only halfhearted defenses of their decisionmaking. Defendants argue that they did consider *one* "aspect of the problem" when issuing the demand, *State Farm*, 463 U.S. at 43: the "cost" to AAMVA of transferring the records, Mot. 22. But they considered no *other* "potential harms," A64—including those arising from CDLIS's shutdown, or potential liability for States or AAMVA arising from unlawful disclosure of personal records. Defendants dismiss these risks as "speculative," Mot. 22, but, again, defendants expressly stated that they would "cancel[] AAMVA's grants" if it did not comply, A26, so the district court cannot be faulted for believing them.

Defendants also argue that they did not need to acknowledge any change in position or account for reliance interests because there was no "'earlier position' from which [they] supposedly departed." Mot. 23. But defendants put in place a regime under which, in their own words, "the records in CDLIS are not controlled by FMCSA," but by AAMVA, and

federal agencies could "access" those records only via CDLIS, 70 Fed. Reg. at 2455. Plaintiffs and AAMVA explained that the demand was "novel," Doc. 46 at 3, and contradicted past practice, Doc. 3-2 ¶ 22. Defendants had to justify that change in position but did not.

Defendants' remaining arguments fare no better. Defendants attempt to justify the demand by referencing declarations filed in the district court, Mot. 22-23 & n.2, but "a court may uphold agency action only on the grounds that the agency invoked when it took the action,'" *Michigan v. EPA*, 576 U.S. 743, 758 (2015), and the declarations' reasoning is found nowhere in the months-long correspondence that predated defendants' final letter. Defendants invoke *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), but *Roe* explains that post hoc materials cannot be considered where they reflect "new rationalizations," *id.* at 220-21, which the declarations do. In any event, even these belated declarations do not explain "how the limited but highly sensitive information" defendants sought "would contribute in any meaningful way" to their stated goals. A93; *see* Doc. 104 at 6-7 (explaining declaration's flaws).

### 2. The demand was contrary to law.

The district court also correctly held that the demand was likely contrary to law.

*a. Consultation.* The court correctly held that the demand likely violates 49 U.S.C. § 31309(a), which requires "[t]he Secretary" to "consult with the States in carrying out this section." Under the "ordinary meaning" of the word "consult," this required defendants to engage in "a dialogue" with the States "*before*" making decisions concerning the maintenance, operation, or design of CDLIS. *HIAS, Inc. v. Trump*, 985 F.3d 309, 320-21 (4th Cir. 2021).

Defendants did not do so. The demand plainly entailed "carrying out" the CDLIS statute: It insisted that AAMVA either effect a significant transformation of CDLIS—by granting custody of state-owned records to DOT—or lose funding, thus shutting down CDLIS altogether. But defendants "do not dispute that they failed to consult the States before issuing the Data Demand." A89-90.

Instead, defendants argue that "there is no textual basis" for distinguishing the demand from an ordinary CDLIS query, and that they do not need to consult with the States before doing the latter. Mot.

16. But the demand directly implicated the Secretary's duties under section 31309 by threatening CDLIS's shutdown. *See, e.g.*, 49 U.S.C. § 31309(a) (Secretary "shall maintain" CDLIS). It also altered the Secretary's policy regarding how information in CDLIS is "made available," *id.* § 31309(c), by insisting that he obtain not access to, but custody of, CDLIS records. A query, by contrast, makes no change in way the Secretary "carr[ies] out" the statute, *id.* § 31309(a); it simply effectuates existing policy.

Defendants also are wrong that they complied with the consultation requirement by undergoing notice and comment before promulgating 49 C.F.R. § 384.225(e)(2). Mot. 16. That regulation does not say or suggest that the Secretary is *entitled* to *custody* of records in CDLIS; it simply prohibits States from broadly disseminating access to those records. *See* 49 C.F.R. § 384.225(e)(2) (States must "only allow" certain entities to "receive" certain records). The Secretary violated section 31309 by failing to consult with the States.

*b.* *Privacy Act.* The district court also correctly held that the demand violated the Privacy Act, which, among other things, requires agencies to provide notice before creating a new database (or "system of

records"). 5 U.S.C. § 552a(e)(4). Defendants have repeatedly stated that CDLIS "is not a Federal system of records" because it is held by AAMVA, and that no existing Privacy Act notice covers CDLIS. 89 Fed. Reg. 50235, 50237 (June 13, 2024); DOT, *Privacy Impact Assessment*, *supra* (same). Defendants' transfer of 17 million CDLIS records from AAMVA's systems to their own thus obligated them to publish such a notice for the first time.

Defendants concede that they did not provide notice, but say that doing so was not required because they intended to add the CDLIS records to the existing "Electronic Document Management System" (EDMS), which houses FMCSA's "compliance review, inspection and enforcement documents," 71 Fed. Reg. 35727, 35727 (June 21, 2006). Mot. 18. But agencies must publish a notice detailing any "revision" of existing databases, 5 U.S.C. § 552a(e)(4)—including changes that "substantial[ly] increase . . . the number, type, or category of individuals about whom records are maintained in the system" or that "modif[y] the scope of the system," including "the combining of two or more existing" databases. OMB Circular No. A-108, at 5-6 (2016).[4] The addition of 17

[4] https://bit.ly/4ewW99X.

million records—one for every commercial vehicle operator in the Nation—to a database built for limited incident-specific information, *see* 71 Fed. Reg. at 35727 (EDMS contains "driver enforcement case documents," including "crash reports"), constitutes a "revision" of that database.[5]

*c.* *DPPA.* The district court also correctly held that the demand violated the Driver's Privacy Protection Act, which generally prohibits States and their agents (like AAMVA) from disclosing "highly restricted personal information" drawn from motor vehicle records. 18 U.S.C. § 2721. Defendants do not dispute that the CDLIS records are covered by DPPA, so the only question is whether an exception to the disclosure prohibition applies. Defendants invoke only the "government use" exception, but the district court correctly held that exception was "likely not applicable" because defendants failed to show they would "actually use all of the records" for an authorized "function." A90.

That conclusion was correct. The government-use exception applies only where the disclosed records are in fact "used to effectuate"

---

[5] The district court also correctly held that the demand likely violated the Privacy Act's minimization requirement and disclosure prohibition. A91.

an authorized governmental function. *Senne v. Vill. of Palatine*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc); *accord McMichael v. James Island Charter Sch.*, 840 F. App'x 723, 730 (4th Cir. 2020) (exception applies only where agency "actually makes use of the information"). Defendants do not attempt to come within that rule: They criticize the district court for "substitut[ing] its own view" of how defendants would use the records, and describe their need as "well-substantiated," Mot. 17, but they do not seriously argue that either their contemporaneous explanations or their post hoc declarations, which reflect merely boilerplate assertions of need, *supra* pp. 15-16, show that defendants would use all the data they sought for a specific statutory purpose.

### 3. The demand violated the Spending Clause.

Finally, the demand violated the Spending Clause. Because States participate in CDLIS in exchange for federal funds, Congress must "clearly" and "unambiguously" notify the States of any condition it imposes. *Landor*, 609 U.S. at 69.

The CDLIS statute nowhere states—let alone "unambiguously"—that States must turn over driver records to the federal government to participate in CDLIS. Instead, it authorizes the creation of CDLIS as a

"clearinghouse and depository of information," and provides that CDLIS records "shall be made available and subject to review" to users under DOT's policies. 49 U.S.C. § 31309(c). A "clearinghouse" is an "intermediary" that "lack[s] ownership or control" over its contents, Doc. 46 at 7 (citing authority), and to make a record "available" to someone for "review" does not entitle him to possess it. The CDLIS statute thus contemplates only that defendants will have *access* to state records, not that they can assert *custody* over those records.

The provisions defendants cite, Mot. 20-21, do not provide the necessary clarity. One allows DOT to require States "to provide [it] access to all State licensing status and driver history records," 49 U.S.C. § 31106(c)(2), but CDLIS pointer records do not contain information about "licensing status" or "driver history," and defendants demand not merely "access" but custody. And though 49 U.S.C. § 31309 authorizes DOT to maintain CDLIS and promulgate an access policy, that too is of no help, including because that policy explicitly disclaims DOT's control over CDLIS records. *See* 70 Fed. Reg. at 2455 ("records in CDLIS are not controlled by FMCSA"). Finally, even if a regulation could provide the clear notice the Spending Clause requires, 49 C.F.R. § 384.225(e)(2)

merely permits States to allow DOT to "receive . . . information on all CDLIS driver records." It, too, does not state that DOT is entitled to assume *custody* of such records.

## II. The District Court Did Not Abuse Its Discretion Issuing Injunctive Relief.

The district court also acted well within its discretion entering a preliminary injunction that "preserve[s] the relative positions of the parties until a trial on the merits can be held." *dmarcian*, 182 F.4th at 305.

### A. Defendants have not shown irreparable injury.

Defendants failed to establish that they will be irreparably harmed absent a stay, for the reasons the district court identified.

Defendants primarily argue that they are irreparably harmed by the injunction because FMCSA has "an ongoing urgent need" for CDLIS records to support efforts "to enforce its statutory safety mandate." Mot. 24. But, as the district court explained, defendants failed "to give any understandable substantive explanation for how" assuming custody of CDLIS records is necessary to advance to those goals, A93, and their stay motion does not cure that deficiency. Defendants assert an "urgent need" to "conduct batch queries" to ensure compliance with federal

regulations. Mot. 2, 24. But these vague assertions do not establish irreparable harm: Defendants identify no regulation that they will be unable to enforce if the injunction remains in effect, or how any such executive impairment could be "likely," *Nken*, 556 U.S. at 434, given that defendants for decades fulfilled their statutory functions under the existing access regime.

Defendants also complain that the preliminary injunction is facially overbroad in that it binds not only defendants but also their "officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them." Mot. 24; A98. That language is taken directly from Rule 65(d)(2), so it is hard to see how it could be overbroad. Nor did the district court impose a "preclearance regime" in denying defendants' clarification motion. Mot. 25. Rather, it observed that defendants had failed to identify any specific "contemplated action, decision, or course of conduct" that might violate the injunction, A100, and invited defendants to renew their request if any such concern arose. The stay motion *still* identifies no specific "course of conduct" the injunction might prohibit, *id.*, underscoring that the court acted within its discretion in fashioning the injunction.

### B. The balance of the equities tilts sharply against a stay.

Staying the injunction would "substantially injure the other parties interested in the proceeding" and damage the "public interest." *Nken*, 556 U.S. at 434.

Most basically, defendants are not injured by interim relief preserving the status quo, whereas the demand would threaten the States, AAMVA, and the public with imminent and substantial harm. A95-96. If AAMVA refuses to comply with the demand, defendants will "cancel[] AAMVA's grants," A26, shuttering CDLIS and "impairing [States'] ability to issue and renew CDLs to qualified individuals and compromising the safe operation of commercial motor vehicles," A97. If AAMVA turns over state records, that would "inevitably compromise[] and undermine[] the public's trust in the Plaintiff States' promises to safeguard their residents' personal information." A95-96. That harm would be "irreversible," given the likely dissemination of the records throughout the federal government. A95.

Defendants complain that these harms are "speculative" and "questionable," Mot. 25-26, but the district court made contrary findings based on an extensive evidentiary record, *see* Doc. 3-22, and defendants

make no serious effort to unseat those findings. Defendants cannot walk back their threats to terminate AAMVA's funding by asserting that it was "[un]likely" they would have followed through. Mot. 26. AAMVA itself thought the threats sufficiently serious to ask the district court to "protect [its] operation of CDLIS while the legal issues in th[e] case [we]re resolved," Doc. 46 at 11, a request the court accepted, A96. This Court should do the same.

## CONCLUSION

The motion should be denied.

Respectfully submitted,


| | |
|---|---|
| BRIAN L. SCHWALB<br>Attorney General<br>District of Columbia | KWAME RAOUL<br>Attorney General<br>State of Illinois |
| CAROLINE S. VAN ZILE<br>Solicitor General<br>ASHWIN P. PHATAK<br>Principal Deputy Solicitor General | JANE ELINOR NOTZ<br>Solicitor General |
| /s/ Mitchell P. Reich<br>MITCHELL P. REICH<br>Senior Counsel to the Attorney General<br>Office of the Attorney General for the District of Columbia<br>400 Sixth St. NW | /s/ Alex Hemmer<br>ALEX HEMMER<br>Deputy Solicitor General<br>KATHLEEN NACCARATO<br>Assistant Attorney General<br>Office of the Illinois Attorney General<br>115 S. LaSalle St.<br>Chicago, IL 60603<br>312-814-3000 |

Washington, DC 20001
202-279-1261
Mitchell.Reich@dc.gov

*Counsel for the District of Columbia*

JAY JONES
Attorney General
Commonwealth of Virginia

TILLMAN J. BRECKENRIDGE
Solicitor General

/s/ Megan C. Keenan
MEGAN C. KEENAN
Deputy Solicitor General
MIKAELA A. PHILLIPS
Assistant Solicitor General
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
mkeenan@oag.state.va.us
mphillips@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

alex.hemmer@ilag.gov

*Counsel for the State of Illinois*

ROB BONTA
Attorney General
State of California

THOMAS S. PATTERSON
MICHAEL L. NEWMAN
Senior Assistant Attorneys General
SETH E. GOLDSTEIN
ROBIN L. GOLDFADEN
Supervising Deputy Attorneys General

/s/ David Green
DAVID GREEN
MARIA BUXTON
CHASE GOLDSTEIN
EZRA KAUTZ
EMILIA P. E. MORRIS
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
916-210-6242
David.Green@doj.ca.gov

*Counsel for the State of California*

KRISTIN K. MAYES
Attorney General
State of Arizona

PHIL WEISER
Attorney General
State of Colorado

/s/ Mary M. Curtin
MARY M. CURTIN
Senior Litigation Counsel
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
602-542-3333
Mary.Curtin@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

/s/ David Moskowitz
DAVID MOSKOWITZ
Deputy Solicitor General
GABE PODESTA
SARAH H. WEISS
Senior Assistant Attorneys General
1300 Broadway, 10th Fl.
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov
Gabe.Podesta@coag.gov
Sarah.Weiss@coag.gov

*Counsel for the State of Colorado*

WILLIAM TONG
Attorney General
State of Connecticut

/s/ Michael Skold
MICHAEL SKOLD
Solicitor General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Michael.Skold@ct.gov

*Counsel for the State of Connecticut*

KATHLEEN JENNINGS
Attorney General
State of Delaware

/s/ Ian R. Liston
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
ANURADHA SIVARAM
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

ANNE E. LOPEZ
Attorney General

/s/ S. Travis Mayo
S. TRAVIS MAYO

State of Hawaiʻi

/s/ Kalikoʻonālani D. Fernandes
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
808-586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

General Counsel
SAM FLYNN
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street, 2nd Floor
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for Governor Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky*

AARON M. FREY
Attorney General
State of Maine

/s/ Halliday Moncure
HALLIDAY MONCURE
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Halliday.Moncure@maine.gov

*Counsel for the State of Maine*

ANTHONY G. BROWN
Attorney General
State of Maryland

JULIA DOYLE
Solicitor General

/s/ Yasmin Dagne
YASMIN DAGNE
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.maryland.gov

*Counsel for the State of Maryland*

ANDREA JOY CAMPBELL
Attorney General

DANA NESSEL
Attorney General

Commonwealth of Massachusetts

/s/ Michelle Pascucci
MICHELLE PASCUCCI
State Trial Counsel
GERARD J. CEDRONE
Deputy State Solicitor
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov

*Counsel for the Commonwealth of Massachusetts*

State of Michigan

/s/ Neil Giovanatti
NEIL GIOVANATTI
Assistant Attorney General
P.O. Box 30212
Lansing, MI 48909
517-241-1050
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

KEITH ELLISON
Attorney General
State of Minnesota

/s/ Lindsey E. Middlecamp
LINDSEY E. MIDDLECAMP
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0711
Lindsey.Middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

AARON D. FORD
Attorney General
State of Nevada

/s/ K. Brunetti Ireland
K. BRUNETTI IRELAND
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

JENNIFER DAVENPORT
Attorney General
State of New Jersey

/s/ Sadia Ahsanuddin
SADIA AHSANUDDIN
Deputy Attorney General

RAÚL TORREZ
Attorney General
State of New Mexico

/s/ Anjana Samant
ANJANA SAMANT
Deputy Counsel

New Jersey Office of the Attorney General
25 Market Street
Trenton, NJ 08625
609-376-3100
Sadia.Ahsanuddin@law.njoag.gov

*Counsel for the State of New Jersey*

New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov

*Counsel for the State of New Mexico*

LETITIA JAMES
Attorney General
State of New York

/s/ Ester Murdukhayeva
ESTER MURDUKHAYEVA
Deputy Solicitor General
28 Liberty St.
New York, NY 10005
212-416-6279
ester.murdukhayeva@ag.ny.gov

*Counsel for the State of New York*

DAN RAYFIELD
Attorney General
State of Oregon

/s/ Robert A. Koch
ROBERT A. KOCH
Attorney-in-Charge, Civil & Administrative Appeals
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
503-378-4402
Robert.A.Koch@doj.oregon.gov

*Counsel for the State of Oregon*

/s/ Jacob B. Boyer
JENNIFER C. SELBER
JACOB B. BOYER
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov

*Counsel for Governor Josh Shapiro, in his official capacity*

PETER F. NERONHA
Attorney General
State of Rhode Island

/s/ Patrick Reynolds
PATRICK REYNOLDS
Special Assistant Attorney General
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903

*as Governor of the Commonwealth of Pennsylvania*

CHARITY R. CLARK
Attorney General
State of Vermont

/s/ Ryan Patrick Kane
RYAN PATRICK KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
802-828-3171
Ryan.Kane@vermont.gov

*Counsel for the State of Vermont*

JOSHUA L. KAUL
Attorney General
State of Wisconsin

/s/ Brian Keenan
BRIAN KEENAN
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
608-266-0020
Brian.Keenan@wisdoj.gov

*Counsel for the State of Wisconsin*

November 12, 2026

(401) 274-4400
preynolds@riag.ri.gov

*Counsel for the State of Rhode Island*

NICHOLAS W. BROWN
Attorney General
State of Washington

/s/ Lauryn K. Fraas
LAURYN K. FRAAS
Assistant Attorney General
800 Fifth Ave., Suite 2000
Seattle, WA 98104-3188
206-464-7744
Lauryn.Fraas@atg.wa.gov

*Counsel for the State of Washington*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 5,199 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Century Schoolbook typeface.

/s/ Alex Hemmer
ALEX HEMMER

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2026, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER